SUPERIOR COURT
OF THE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

November 23, 2015

Kathryn J. Garrison, Esquire
Department of Justice
114 East Market Street
Georgetown, DE 19947

Kathi A. Karsnitz, Esquire
115 S. Bedford Street
Georgetown, DE 19947

Craig A. Karsnitz, Esquire
Young, Conaway, Stargatt & Taylor, LLP
110 West Pine Street
P.O. Box 594
Georgetown, DE 19947

Maria T. Knoll, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

**RE:** ***State of Delaware v. Emmett Taylor, III***
**Cr. A. No. S07-08-1257, 07-10-0723, 0724**
**Def. ID No. 0708020057**

Dear Counsel:

This is my decision on Emmett Taylor's Motion for Postconviction Relief.

Taylor was convicted of Murder in the First Degree, Possession of a Deadly Weapon

During the Commission of a Felony, and Abusing a Corpse. The convictions arose

out of Taylor's fatal beating of his fiancé, Stephanie Mumford, and his abuse of her

corpse by putting cucumbers in her vagina and rectum, on August 13, 2007. I

sentenced Taylor to death. Taylor's convictions and death sentence were affirmed by

the Delaware Supreme Court on September 12, 2011.[1] Taylor argues that his trial and

---

[1] 28 A.3d 399 (Del. 2011).

appellant counsel failed to adequately represent him. I have denied Taylor's Motion for Postconviction Relief, concluding that the errors made by Taylor's counsel were inconsequential and did not raise a reasonable probability that but for those errors the outcome of Taylor's trial would have been different.

## Introduction

Emmett Taylor beat Stephanie Mumford to death in the townhouse they shared on August 13, 2007. Taylor then placed cucumbers in her vagina and rectum and took pictures of them. Taylor then fled the townhouse, leaving Mumford's children to find her naked and battered body the next day in the bathroom of her townhouse. Taylor was captured a few days later in Washington, D.C.

The State of Delaware charged Taylor with Murder in the First Degree, Possession of a Deadly Weapon During the Commission of a Felony, and Abusing a Corpse. The State sought the death penalty. The trial started on October 5, 2009, and ended on October 30, 2009. The jury found Taylor guilty of all three charges.

The penalty phase started on November 2, 2009, and ended on November 5, 2009. The jury found unanimously and beyond a reasonable doubt that Taylor had been convicted of a felony involving the use of force or violence upon another person. This was the sole statutory aggravating circumstance. The jury then found, by an eleven to one vote and by a preponderance of the evidence, that the aggravating

2

circumstances outweighed the mitigating circumstances.[2] The jury recommended that Taylor be sentenced to death. I agreed with the jury's recommendation and sentenced Taylor to death.

<u>The Guilt Phase</u>

Taylor and Mumford were engaged to be married and living together in a rented townhouse in Long Neck, Delaware. Taylor was 44-years-old and worked as a fireplace installer for Artistic Fireplaces in Bridgeville, Delaware. Mumford was 44-years-old and worked as a sales clerk in the jewelry department at Walmart in Georgetown, Delaware. They had known each other for approximately six months and were to be married on Saturday, August 18, 2007. Mumford had three children from a prior relationship.

Monday, August 13, 2007, started out uneventfully for Taylor and Mumford. Taylor and several co-workers installed a fireplace at a home in Newark, Delaware. After work, Taylor and two friends, Carlton Gibbs and Victor Perez, went to Taylor's townhouse and sat around the kitchen table talking and drinking.

Mumford spent part of the evening practicing dance routines for her wedding with her sisters, Samantha Smith and Debbie Morris. Both sisters testified that Taylor and Mumford talked on the phone about dinner. Mumford left her sisters and went

_____

[2]  11 *Del. C.* §4209(c).

3

to pick up her daughter, Shaunna Mumford, from her job at a car dealership. Taylor called Mumford again and complained about his dinner not being ready. Mumford left Shaunna at the car dealership and went to the townhouse. Shaunna got a ride home with her boyfriend.

When Mumford arrived at the townhouse, Taylor, Gibbs and Perez were still in the kitchen drinking. Taylor and Mumford argued about dinner. Taylor wanted to know when his dinner would be ready. Mumford told him that he could get his own dinner. Taylor told Mumford to leave the townhouse. Taylor was embarrassed by the argument. Mumford left the townhouse, but came back a short time later. Gibbs and Perez left the townhouse when they ran out of alcohol around 10:00 p.m. Taylor and Mumford continued to argue. Mumford called a friend, Luther Mitchell, three times that evening. Mitchell testified that each time they spoke, Mumford sounded more upset. He also testified that Taylor had called Mumford dirty names and told her to leave the townhouse.

Mi Young Jung lived in the townhouse next to Taylor and Mumford. She testified that on the night in question, around 10:00 to 10:30 p.m., she heard a lot of banging next door. Mi Jung also testified that she heard Taylor, in a loud angry voice, tell Mumford to "get out of here." The next day Mi Jung saw that Mumford's Chevrolet Tahoe was gone.

4

Taylor and Mumford did not go to work the next day, Tuesday, August 14, 2007. No one heard from them and they did not answer their cell phones either. Taylor and Mumford were supposed to go to their wedding rehearsal that evening. When they did not appear and no one could reach them, Shaunna and her brother, Nate, and some other family members went to the townhouse. They found Mumford's naked, lifeless body on the floor in the second floor bathroom. Taylor was not in the townhouse.

Taylor and Mumford's townhouse had three floors. A garage and stairway are on the first floor. A kitchen, living room and bathroom are on the second floor. Three bedrooms and two bathrooms are on the third floor. It was obvious that a struggle had taken place on the second floor and on the stairway between the first and second floors. There were large dents in the drywall in the stairway. Hair, blood, fingernails and a partial denture were found at the bottom of the stairway. Hair and blood were found on the stairway steps. The police found sneakers, socks, underwear, pants, a wig and a bra on the second floor. The police also found a bloody blue shirt, a bloody white sock, one-half of a black bra, a bloody paper towel, alcoholic beverage bottles and cucumbers in a trash can in the kitchen. There was a broken flower planter and a lot of blood spatter in the kitchen. The police also found a misshapen frying pan on the kitchen island. A family member later found a bloody

5

knife on top of the refrigerator.

Taylor was captured in Washington, D.C. on August 17, 2007. The police found Mumford's Tahoe in Washington, D.C. Delaware State Police Detective William Porter interviewed Taylor in Washington, D.C. Taylor made a number of incriminating statements during his interview with Detective Porter. The police found two cell phones and a pair of bloody jeans belonging to Taylor in the Tahoe. One of the cell phones contained pictures of Mumford with cucumbers in her vagina and rectum. Mumford died of blunt force trauma to head.

Taylor testified at his trial. Taylor had been drinking, having had at least a half pint of Crown Royal before he and Mumford argued. Taylor stated that he was irritated with Mumford and that she had disrespected him that evening and cursed him out in front of his friends. Taylor asked Mumford to leave and she did, returning about 20 minutes later in a better mood. Taylor's friends left around 10:00 p.m. After that, Mumford became increasingly agitated and threw clothes around the house as Taylor watched. At one point, Mumford appeared to calm down and went to the sink and started chopping food for dinner. Taylor said he went to stand behind Mumford to grab a tumbler from the cabinet above her. Mumford spun around with a butcher knife. Taylor, thinking she was trying to cut him, grabbed Mumford's hand as she came towards him. Mumford grabbed his shirt and they struggled over the knife.

6

Taylor picked up a frying pan and, at first, swiped the knife with it, but then struck her head with it. Taylor and Mumford struggled all over the house, knocking things over as Mumford just became stronger and stronger. Taylor finally got the knife away from Mumford and put it on top of the refrigerator. Taylor also put the frying pan down. Mumford was holding her bleeding face and crying. Taylor decided to leave and headed for the front door. As he got to the first set of steps, Taylor said that Mumford grabbed him by the arm and jumped on his back to keep him from leaving. Taylor spun around and they hit the wall but Mumford would not let go. Taylor spun around again and they both fell down the stairs with Taylor on top of Mumford. Mumford's head went through the wall at the bottom of the landing. Taylor denied throwing or pushing Mumford down the stairway. Because her head was bleeding, Taylor told Mumford that she needed a doctor, but she refused and stated she was fine. Taylor and Mumford went to the garage and washed the blood from her hair and then walked back into the house and took off her wet clothes. During this time, Mumford became amorous and Taylor ripped off her bra and panties. Mumford got cucumbers from the refrigerator and baby oil from the bedroom and they engaged in consensual sexual activity using cucumbers, which Taylor photographed. While taking the photographs, Taylor noticed that Mumford's face had started to swell. Taylor took at least one more picture and then they went to the bathroom where

7

Mumford spat blood. Mumford stayed in the bathroom. Taylor went to the couch and fell asleep. When Taylor woke up, Mumford was dead in the bathroom. Because she was dead, Taylor did not even consider calling 911. Taylor panicked and "got the hell out of there," ending up in Washington, D.C., where he was taken into police custody four days later. When asked why he did not provide this detailed information to Detective Porter, Taylor stated repeatedly that he was not asked.

## The Verdict

The jury found unanimously and beyond a reasonable doubt that Taylor was guilty of Murder in the First Degree, Possession of a Deadly Weapon During the Commission of a Felony, and Abusing a Corpse.

## The Penalty Hearing[3]

### The Statutory Aggravating Circumstance

The State alleged that the sole statutory aggravating circumstance was that Taylor was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person.[4] The State sought to prove the statutory aggravating circumstance by offering the testimony of Earline Harris. Harris was in a romantic relationship with Taylor for several years

---

[3] I have only addressed the aggravating and mitigating circumstances that Taylor discussed in his Motion for Postconviction Relief.

[4] 11 *Del C.* §4209(e)(i).

8

while they lived in Biloxi, Mississippi. Harris and Taylor got into an argument while they were in a casino gambling on February 14, 2002. Taylor got mad at Harris and beat her so badly that she was hospitalized for four days with a facial fracture. The State of Mississippi indicted Taylor on the charge of aggravated assault on November 18, 2002. Taylor entered an *Alford* plea to the charge of aggravated assault on September 11, 2006. The State entered into evidence the police reports, medical records, court records, and other documents relating to the incident and the resolution of the criminal charge against Taylor. The Court in Mississippi sentenced Taylor to 10 years in jail, suspended for the time that he had already served, followed by three years of post-release supervision. The jury found unanimously and beyond a reasonable doubt that the State had proven the sole statutory aggravating circumstance. This finding made Taylor eligible for the death penalty.

### The Non-Statutory Aggravating and Mitigating Circumstances

The State alleged nine non-statutory aggravating circumstances. Taylor alleged 16 mitigating circumstances. The State alleged that Taylor had a history of domestic violence towards women.

### Domestic Violence

Harris testified that Taylor started beating her one month into their relationship and beat her frequently. Taylor broke her ankle during one of the beatings. While

9

Harris was recovering from her broken ankle, Taylor beat her in the head with one of her crutches. After the beating, Taylor anally raped Harris. The beatings culminated with a violent beating on February 14, 2002. Taylor beat Harris so badly that she had to be taken to the intensive care unit at the Biloxi Regional Medical Center for a facial fracture. During the beating, Taylor tried to force Harris to perform fellatio on him.

Dissociative Identity Disorder

Taylor argued that he had a history of mental illness including Dissociative Identity Disorder, Generalized Anxiety Disorder, Major Depression, Single Episode, Alcohol Dependence and Adult Antisocial Behavior.

Taylor tried to prove this mitigating circumstance by offering the testimony of Joseph C. Zingaro, Ph.D. Dr. Zingaro is the Clinical Director of Peoples Place, Inc., a counseling center in Milford, Delaware. He reviewed Taylor's educational, medical, criminal, and military records. Dr. Zingaro also interviewed Taylor's uncle and sister. Dr. Zingaro interviewed Taylor multiple times and gave him a battery of psychological tests. Dr. Zingaro testified that Emmett Taylor suffers from Dissociative Identity Disorder, Generalized Anxiety Disorder, Major Depression, Single Episode, Alcohol Dependence, and Adult Antisocial Behavior.

The State challenged Dr. Zingaro's testimony. The State offered the testimony

of Stephen Mechanick, M.D. Dr. Mechanick is a psychiatrist. Dr. Mechanick has an outpatient general adult practice in Bryn Mawr, Pennsylvania. Dr. Mechanick reviewed Taylor's educational, medical, criminal, and military records. Dr. Mechanick also reviewed the videotaped interviews of Taylor's sister and uncle. Dr. Mechanick also interviewed Taylor. Dr. Mechanick testified that Taylor had pre-existing and ongoing problems with alcohol and cocaine abuse, and that he had a personality disorder with anti-social features. Dr. Mechanick testified that Taylor did not have Dissociative Identity Disorder.

The evidence showed that Taylor did abuse alcohol and cocaine, that he did suffer from anxiety at times, particularly over money, that he was depressed at times, and that he exhibited anti-social behavior at times. The significant dispute was over Dr. Zingaro's diagnosis of Dissociative Identity Disorder.

Dissociative Identity Disorder, previously known as multiple personality disorder, is a dissociative disorder involving a disturbance of identity in which two or more separate and distinct personality states, or identities, control the individual's behavior at different times. When under the control of one identity, the person is usually unable to remember some of the events that occurred while other personalities were in control. The different identities, referred to as alters, may exhibit differences in speech, mannerisms, attitudes, thoughts, and gender orientation.

11

Dr. Zingaro testified that Taylor had three distinct personalities: (1) the Emmett Taylor that most people knew and would recognize; (2) the workaholic Emmett Taylor that was so focused on his work that he would skip his breaks and lunch to finish a job; and (3) the Sergeant Emmett Taylor that protected Taylor from both physical and psychological threats.

Dr. Zingaro's explanation of Mumford's murder is straightforward and based on Taylor's alleged Dissociative Identity Disorder and the events that triggered an appearance by Sergeant Emmett Taylor. On the night in question, Taylor was worried about not having enough money and having second thoughts about marrying Mumford. Taylor was meeting with Gibbs and Perez to plan a business venture when Mumford came home and argued with him about dinner and accused the two men of being drug dealers. Mumford's behavior embarrassed Taylor in front of his friends. Taylor and Mumford continued to argue after the two men left. When Mumford turned on Taylor with a knife, Sergeant Emmett Taylor came out and killed Mumford.

Dr. Mechanick testified that Taylor did not meet the criteria for a diagnosis of Dissociative Identity Disorder. Dr. Mechanick believed that there was simply no evidence of at least two distinct personalities. Instead, according to Dr. Mechanick, everything supported his conclusion that Taylor had only one personality.

Dr. Mechanick testified that Taylor was always the same person, but that he

12

was simply a violent man with a short fuse. When Mumford embarrassed Taylor in front of his friends, and then insulted them, Taylor lost his temper and beat her to death later that night.

I found that by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances and sentenced Taylor to death.

<u>Taylor's Arguments for Postconviction Relief</u>

Taylor argues that his Trial Counsel were ineffective because:

1.  They did not file a motion requesting me to sever the Abusing a Corpse charge from the other two charges.

2.  They did not use Mi Jung's allegedly conflicting statements to attack her credibility.

3. They did not prevent the submission to the jury of an "evidence bag mischaracterizing the murder weapon as bloody."

4. They did not retain a forensic pathologist to determine the cause and manner of Mumford's death.

5.  They did not retain a cookware expert to determine the degree of force necessary to damage the frying pan.

6.  They did not retain experts who would testify that Mumford sustained a fatal head injury when her head crashed into the wall at the base of the stairway and that the frying pan was not the murder weapon, which prevented them from being able to negotiate a plea to something less than Murder in the First Degree.

7.  They were so focused on preparing a mental illness defense based on

13

Dissociative Identity Disorder over Taylor's objection that it precluded them from preparing for his chosen trial strategy of self-defense and accidental fall.

8. They failed to object to two incidents of prosecutorial misconduct that occurred during the prosecutor's closing arguments.

9. They did not object to the admission into evidence of a crime scene video that had commentary from two unidentified individuals speculating that Taylor threw Mumford down the stairway.

10. They did not object to the State's use of Dr. Mechanick's psychiatric evaluation of Taylor during the penalty hearing.

11. They did not object to Harris's testimony at the penalty hearing about the two other times that Taylor beat her.

12. They did not ask me for a jury instruction on the nature of an *Alford* plea and did not ask me for permission to offer evidence to the jury on the nature of an *Alford* plea.

13. They did not adequately challenge the constitutionality of Delaware's death penalty statute.

Taylor argues that his Appellate Counsel were ineffective because they did not raise on appeal to the Delaware Supreme Court the following issues:

1. The State's use of Taylor's *Alford* plea to the aggravated assault charge in Mississippi as the sole statutory aggravating circumstance.

2. The State's alleged *Brady* violation.

3. The admission into evidence of the bag labeled "fry pan with blood."

4. The admission into evidence at the penalty hearing of Harris's allegations of Taylor's uncharged misconduct in Mississippi.

5. The State's use of Dr. Mechanick's testimony at the penalty hearing.

6. The State's allegedly improper statements in both its closing and rebuttal arguments to the jury.

7. The constitutionality of Delaware's death penalty statute.

Standard of Review

Taylor has moved for post-conviction relief pursuant to Superior Court Criminal Rule of Procedure 61 seeking to vacate his convictions and sentences on all three charges presented in the indictment. Taylor argues that due to the ineffective assistance of his Trial Counsel that he was deprived of a fair trial. Taylor must demonstrate that: 1) Trial Counsel's professional performance was so deficient that they were not "functioning as the 'counsel' guaranteed...by the Sixth Amendment;" and 2) "the deficient performance prejudiced the defense."[5] In applying the *Strickland* standard, I must first analyze whether Taylor's Trial Counsel's professional conduct fell below an objective standard of what is reasonably expected of trial counsel.[6] If so, I must decide whether there is a "reasonable probability that, but for his Trial Counsel's unprofessional errors, the result of the proceeding would

---

[5]*Strickland v. Washington*, 466 U.S. 668, 687. (1984). Delaware Courts applying Delaware law use the *Strickland* standard. *Cooke v. State*, 977 A.2d 803, 848 (Del. Supr. 2009).

[6] *Cooke v. State*, 977 A.2d 803, 848 (Del. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668 (1984)).

15

be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[7]

To substantiate ineffective assistance on appeal, Taylor must show that his Appellate Counsel failed to raise issues stronger than those raised on appeal and that prejudice resulted.[8]

## Argument 1

## Severance of the Abuse Charge

Taylor argues that his Trial Counsel should have filed a motion requesting me to sever the Abusing a Corpse charge from the Murder in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony charges because (1) the abuse charge was not properly joined in the indictment with the other two charges, and (2) the photographs of the cucumbers in Mumford's vagina and rectum that the State used to prove the abuse charge were of minimal relevance to the murder charge and unfairly prejudicial. Taylor argues that the cucumber photographs made him look like a monster who used Mumford's body as a sex toy. Trial Counsel did not seek to sever the abuse charge because (1) they thought their request would not be successful, and (2) the cucumber photographs supported their mental illness

---

[7] *Strickland,* 466 U.S. at 694; *Cooke*, 977 A.2d at 848.

[8] *Ploof v. State*, 75 A.3d 811, 932 (Del. 2013).

16

defense. I have concluded that joinder of the abuse charge with the other two charges was proper and that it would not have been severed from the other charges.

Joinder

The joinder of charges is governed by Superior Court Criminal Rule 8(a). This rule states, in applicable part, the following:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Taylor argues that the only possible basis for joinder is that the murder and abuse charges constituted two or more acts or transactions connected together. Taylor argues further that the connection between the charges was that they involved him and occurred within a relatively brief time span. This connection, according to Taylor, was of little consequence because temporal and geographic proximity and the fact that the same defendant is alleged to have performed each act does not determine joinder.[9]

I disagree. Taylor views the murder and abuse charges as based on unconnected events. They are not. The acts that gave rise to the murder and abuse

---

[9] *Drummond v. State*, 56 A.3d 1038 (Del. 2012), citing *Monceaux v. State*, 51 A.3d 474 (Del. 2012); *State v. McGraw*, 2002 WL 1038823 (Del. Super. May 16, 2002).

charges are closely connected together. Indeed, the acts that gave rise to the murder and abuse charges are part of one continuous series of events, starting with the argument between Taylor and Mumford in the kitchen and ending with Taylor fleeing to Washington, D.C. In between, Taylor beat Mumford to death and abused her corpse. Leaving out a critical act – the abuse of Mumford's corpse that occurred in the middle of this sequence of connected events – would have made no sense because it would have left a gaping hole in the tragic story of what happened that night between Taylor and Mumford. Thus, I conclude that the murder and abuse charges were properly joined in the indictment.

Severance

The severance of charges is governed by Superior Court Criminal Rule 14. This rule states, in applicable part, the following:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Charges should be severed if there is a reasonable probability that substantial prejudice will result from a joint trial on the charges.[10] Prejudice that the court considers includes that: 1) the jury may cumulate the evidence of the various crimes

---

[10] *Bates v. State*, 386 A.2d 1139, 1141 (Del. 1978).

charged and find guilt when, if considered separately, it would not so find; 2) the jury may use evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crimes; and 3) the defendant may be subject to embarrassment or confusion by presenting different defenses to different charges.[11]  It is only unfair prejudice that must be avoided.[12]  A defendant is not entitled to severance merely because he might stand a better chance of being acquitted of one or the other charges in separate trials.[13]  Taylor has the burden of establishing unfair prejudice.[14]

Taylor argues that he was unfairly prejudiced because joinder of the murder and abuse charges allowed the cucumber photographs to be admitted into evidence. Taylor argues further that the cucumber photographs are obscene and highly inflammatory and portrayed him as perverse and having a total disregard for human dignity. Taylor argues further that the cucumber photographs added virtually nothing to proving the murder charge, but did cause the jury to believe that he had murdered Mumford.  In sum, Taylor argues that the probative value of the cucumber

---

[11]  *Wiest v. State*, 542 A.2d 1193, 1195 (Del. 1988).

[12]  *United States v. Rodriguez-Estrada*, 877 F. 2d. 153, 156 (1st Cir. 1989).

[13]  *Bradley v. State*, 559 A.2d 1234, 1241 (Del. 1989).

[14]  *Bates v. State*, 386 A.2d at 1141.

19

photographs in proving the murder charge was outweighed by the unfair prejudice they created. Taylor argues that severing the abuse charge and excluding the cucumber photographs would have made his acquittal on the murder charge substantially more likely.

I disagree. Taylor has (1) understated the prohibitive value of the cucumber photographs in proving the murder charge, disproving Taylor's defenses, and explaining Taylor's reason for murdering Mumford and abusing her corpse; (2) overstated the prejudice of the cucumber photographs; and (3) failed to appreciate that the proof of the murder and abuse charges are inextricably intertwined.

### Probative Value

The cucumber photographs were very useful in proving the murder charge, disproving Taylor's defenses, and explaining Taylor's motive for murdering Mumford and abusing her corpse. Taylor was captured in Washington, D.C., four days after Mumford's children found her dead. Detective Porter traveled to Washington, D.C., and interviewed Taylor. Taylor, while acknowledging that the cucumber photographs showed that he was present in the townhouse at a certain time, argues that this could have been established without showing the cucumber photographs to the jury. While that is true to some extent, it would still have left out very important evidence in the case.

Taylor's interview, while it contains a number of incriminating statements, leaves much about Mumford's murder unknown. Taylor told Detective Porter that on the day in question (1) he was stressed-out over work and the cost of the wedding, (2) Mumford came into the townhouse and argued with him in front of his two friends, (3) after his friends left Mumford was at the kitchen sink using a knife, (4) Mumford turned around towards him with the knife in her hand, (5) he grabbed Mumford's wrist and hit her with the frying pan, (6) this started another fight that was one-sided, and (7) he left the townhouse and went to Washington, D.C. Taylor was very vague about the details of what had happened. Taylor also left out some very important details. Taylor did not tell Detective Porter that Mumford jumped on his back in an effort to keep him from leaving the townhouse, causing both of them to fall down the stairway with Mumford crashing her head into the wall at the base of the stairway so hard that it left an indentation in the drywall. Taylor also did not tell Detective Porter that after the fall down the stairway that he and Mumford then walked into the garage so that he could wash the blood out of her hair. Taylor also did not tell Detective Porter that after he washed the blood out of Mumford's hair that they went back into the townhouse and she became sexually aroused and went upstairs and got some cucumbers for them to use as sexual toys. Taylor also did not tell Detective Porter that he took pictures of Mumford's naked body on the floor with

21

cucumbers in her vagina and rectum. Taylor gave a very detailed story of what happened at the trial, testifying that Mumford's death was caused by his efforts to defend himself from her knife attack in the kitchen and her accidental fall down the stairway going from the second floor to the first floor as he tried to leave the townhouse.

Flight and Consciousness of Guilt

The cucumber photographs prove that Taylor knew Mumford was dead when he left the townhouse and fled to Washington, D.C. This is powerful evidence of his consciousness of guilt and undermines his trial strategy of self-defense and accidental fall. Taylor argues that the cucumber photographs had minimal relevance in proving the murder charge, stating that during his interview with Detective Porter he had already acknowledged that he was present during the altercation and had found Mumford dead. That is only partially correct. Taylor did acknowledge in his interview with Detective Porter that he was present during the altercation, but he did not tell Detective Porter that he had found Mumford dead. Taylor testified in his defense at trial that he found Mumford dead. However, Taylor tried to minimize the situation, explaining that after he and Mumford had sex with the cucumbers that she was alive and in the bathroom spitting up blood. Taylor told the jury that he then went to sleep and that when he woke up around 3:00 a.m. to 4:00 a.m. he found

22

Mumford dead in the bathroom. Taylor testified that he did not call for help because Mumford was dead and instead panicked and "got the hell out of there."

The cucumber photographs prove that Taylor knew Mumford was dead before he left the townhouse. The cucumber photographs were found on Taylor's cell phone when he was arrested in Washington, D.C. This proves that Taylor took them. The cucumber photographs were taken from 12:32 a.m. to 12:36 a.m. This proves that Taylor was in the townhouse at that time. The cucumber photographs prove that Mumford was dead at that time because her naked, beaten and battered body was in an unnatural and awkward position with cucumbers in her vagina and rectum. A living person does not look like that. The cucumber photographs prove that Taylor knew Mumford was dead when he fled the townhouse, discarded his bloody shoes on the side of the road, and went to Washington, D.C. Taylor told Detective Porter that he planned to head west and get lost in the big cities out there. The cucumber photographs prevented Taylor from credibly arguing at trial that Mumford was alive when he left the townhouse. The cucumber photographs proved that Taylor's flight was consciousness of guilt. Taylor's consciousness of guilt is powerful evidence that he fled to avoid being held accountable for murdering Mumford. Moreover, if Taylor was not responsible for Mumford's death because she died as a result of her own actions, then you would have expected Taylor to behave differently than he did.

23

Taylor should have called for medical assistance for Mumford while she was alive if he had not done anything wrong. Taylor should have called the police after he found Mumford dead to explain what had happened if he had not done anything wrong. Taylor did not do those things because he knew that he was responsible for Mumford's death. Taylor's flight is powerful evidence of his consciousness of guilt. The cucumber photographs were very important in explaining why Taylor fled and, in turn, proving that he murdered Mumford.

### Taylor's Defenses

The cucumber photographs prevented Taylor from leaving out a critical aspect of the murder and forced him to come up with a preposterous story about having sex with Mumford after he had beaten her senseless and thrown her down the stairway. The cucumber photographs dealt with Taylor's self-defense argument that he raised in his statement to Detective Porter and the accidental fall down the stairway defense that he raised in his trial testimony. Mumford was, according to Taylor, so mad at him that she turned on him with a knife. Taylor allegedly defended himself by hitting her with a frying pan and then engaged in a one-sided fight with Mumford that left her battered and bleeding while Taylor had nary a scratch on his body. When Taylor told Mumford that he was leaving, she allegedly jumped on his back to prevent him from leaving, causing them to both fall down the stairway and Mumford's head to

24

crash into the wall at the base of the stairway so hard that it left a dent in the drywall. Taylor and Mumford then went into the garage so that Taylor could wash the blood out of her hair. Then, according to Taylor, he and Mumford went back into the townhouse and she became sexually aroused and went upstairs to get cucumbers for use as sexual toys, which, according to Taylor, was a part of their normal sexual practice. If the cucumber photographs had not come into evidence, either as proof of the abuse charge or as rebuttal to Taylor's defenses, then Taylor certainly would not have had to deal with them. Instead, he was forced to explain why he took photographs of Mumford's naked body lying on the floor with cucumbers in her vagina and in her rectum while her battered face is conveniently not shown. That was, of course, after she had been hit with a frying pan and "fallen" down the stairway. In attempting to explain the cucumber photographs, Taylor concocted a preposterous story of Mumford wanting to have sex with him after she had taken a horrible beating at his hands that ultimately killed her. The cucumber photographs were very useful in attacking Taylor's credibility. Thus, once again, the cucumber photographs were very useful in proving that Taylor had murdered Mumford.

Taylor's State of Mind

The cucumber photographs were powerful evidence of Taylor's state of mind, which applies to both the murder and abuse charges. Taylor murdered Mumford

25

because he was furious with her for disrespecting him. Taylor abused Mumford's corpse to disrespect her. Being respected is very important to Taylor. The importance Taylor placed on respect appears in both Taylor's interview with Detective Porter and his trial testimony.

Taylor's Statement to Detective Porter

WP: I want to know what happened? I'm just...look I've been doing this 18 years Emmett okay.

ET: Right.

WP: Each time I talk to somebody that's been involved in a crime like you've been involved in, I'm curious as an investigator what happened in this room. Well, you know, reasons you know, did you hit her with the frying pan? You're saying you remember picking it up.

ET: Yeah I remember picking it up.

WP: Do you remember hitting her with it?

ET: I...yeah...yeah...I had hit her with it you know. I think...it was a self defense mechanism you know. Black woman with a knife syndrome type thing you know. <u>And that's...I think that's where the initial rage started. You got a knife at me? The same guy that went broke tying to pay all your bills and marry you and it just...that's when I took an itty bitty snowball, and rolled it and let it melt. If...if that's an analogy for you that you can understand.</u> I mean combined with everything else and it took off.[15]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[15] Court Ex. N. 9 at 13-14.

WP: Do you remember if she was saying anything to you during this fight?

ET: Only thing I remember realistically...is me walking to the sink and she was cutting up something...opening something with a knife and I went to the sink to get ice or something – or a glass or I don't remember and she turned around and she had the knife and I just instantly grabbed her wrist. And not that, I'm not saying that she did it intentionally,

WP: Right.

ET: You know what I'm saying

WP: She turned with a knife...I mean she's not saying, "Emmett I'm gonna kill you" with a knife, you're just saying she turned with a knife.

ET: I think she might have felt that I was upset. Because if I had told her to go ahead wherever you're going, wherever you been, whatever you have been doing, I said go back and do it. You know what I'm saying? And I...we was basically...I was joking with her. I think that she became mad because to me it was funny but it wasn't funny, I was just trying to be humorous and just try to make the rest of the week man. And when she came in the house me and Carl was sitting there and me and Carl and his friend were sitting there and we was just drinking, and she came in and just came to the stairs and raised a million lies worth of hell. Emmett Taylor I've been looking for you. All this carrying on and all this screaming and stomping and picking up stuff, she's throwing it all over the house.

WP: <u>In front of your friends</u>?

ET: <u>Yeah. Yeah I said babe why are you talking – I'm grown. I pay bills here. I pay your bills you know. I don't care. I don't give a fuck you know</u>. And ahh anyway off we go. I said give me the keys. I said I also have to get out of here. Which I wasn't. I was just gonna go outside. And umm she threw the keys or something and I can't remember man I can't really remember. Anyway in the process of me going to get the keys, this is after the knife deal you know what I'm saying. And in the

process of going to get the keys all this other shit started happening man and we tussled and shit and now I can't really remember man. And we fought - not really.

WP: It was a one-sided fight. I mean I'm just saying that right or wrong.

ET: Of course you're right.[16]

Taylor's Trial Testimony

Q.   And did there come a time when Stephanie came to the condo unit?

A.   Yes.

Q.   How long was it that you were there with Carlton and Victor before Stephanie got there?

A.   Minutes. Minutes. Less than ten minutes.

Q.   Less than ten minutes?

A.   Yes, sir.

Q.   What happened when Stephanie got to the apartment, condo unit?

A.   She came up the stairs and we were all sitting in the kitchen area.

And, "Emmett Taylor, where you been?"

And then when she saw Carlton and Victor, she just - - her demeanor changed and she became argumentative

Q.   Was she cussing you out?

A.   Yes, sir.

---

[16] Court Ex. N. 9 at 18-19.

Q. And what was she upset about?

A. I don't know. I'm not sure if she was upset because I didn't answer the call, or that I avoided her down in Lingo Creek, or that I possibly caught her in a lie.

Q. Was she raising her voice?

A. Yes.

Q. Was she upset?

A. Yes.

Q. And she asked you where you had been?

A. Yes.

Q. And what was your response to her?

A. I told her I had been at work; I had been down and dropped the TV off and I been at home, where she should have been. That was my response.

Q. Did you tell her to leave?

A. Not at the point. Not immediately. I told her that I have company, and I asked her - - first of all, I told her, how you doing? I've got company.

   And I said, I'd ask you to respect my company while we're discussing some things.

   And she goes, well, I live here, too.

   I said, you're right. I says, well – - how did I put it?

   I said, yeah, you do, but you living here doesn't get any bills paid. I said, I'm trying to get some bills paid here and trying to figure out a way

29

to make some money so we can live this way.

And, she says, well, I don't give a "F" if I don't pay no bills here. I want them to get out of my house, just like that.

And I explained to her that I'm paying bills; I don't see her in line to pay any bills, I only see myself when I'm paying bills.

She says, I'm going to be your wife.

I say, yes, you are going to be my wife, but you're not my wife yet.

I said - - and I asked her, said, Stephanie, I says, don't act like this. This is unbecoming. You're not acting like a very good hostess.

I don't give a such-and-such, and I don't give - - she carried on and carried on.

I says, being that you feel that way, I says, why don't you just grab your things and why don't you just leave, if you're going to conduct yourself like that? I said, you're not showing me any respect; you're not showing my home any respect; you're not showing my efforts any respect. And so I would just ask that you leave. And she did.

Q.    How long was she gone?

A.    Fifteen, 20 minutes.

Q.    And she came back?

A.    Yes, sir.

Q.    And what happened when she came back?

A.    When she came back, she wasn't argumentative, she wasn't combative. She engaged the company that was there in a more hospitable manner. But there still was that air of, well, she wanted to - - and I thought it was

30

time for them to go as well, because I mean, it was an awkward situation for all of us.  So we walked outside.

Q.     Whose we?

A.     Myself, Carlton and Victor.  And we walked outside.  And I think Stephanie had showed them the ring and invited them to the wedding, things of that nature, and they left.

Q.     And where did you go?

A.     I went upstairs.

Q.     What happened when you went upstairs?

A.     Well, when I came up, I noticed Stephanie was in the kitchen.  And although I could tell that she was avoiding the issue, I wanted to ask her about why wasn't she being forward with me about where she was at and what she was doing, as opposed to getting into all of that - - I told her, I said, Stephanie - - I walked behind her and she was standing at the sink.

Q.     Before we get to that point, had there come a time during the course of the evening that you had told Stephanie that you didn't want to get married and that she should move back to Frankford?

A.     Yes.

Q.     When did that occur?

A.     This occurred when she left the first time.  Yes, sir.

Q.     What did you say to her?

A.     <u>I told her that being that she didn't respect where she lives, I told her that she should go spend a couple weeks over there in the double wide</u>

31

in Frankford until she get her mind right.[17]

Mumford did not respect how difficult Taylor's work was. Mumford bothered Taylor by calling him too often at work. Mumford did not trust Taylor. Mumford was, on the day in question, driving around looking for Taylor. Taylor thought Mumford was looking for him. This made Taylor mad because Mumford was not where she was supposed to be, which was at home cooking his dinner instead of looking for him. Mumford did not respect Taylor's payment of her bills. Mumford did not respect Taylor in front of his friends while he was discussing an important business venture. Taylor told Detective Porter that he went into a rage when Mumford turned to face him with the knife, stating:

> "I think that's where the initial rage started. You got a knife at me? The same guy that went broke trying to pay your bills."[18]

Taylor flew into a violent rage and killed Mumford because she disrespected him. This puts the murder charge in context. Taylor disrespected Mumford's naked corpse in turn by placing cucumbers in her vagina and rectum and taking photographs of her in that condition. Taylor did not use Mumford's dead body as a sex toy by putting cucumbers in her vagina and rectum. Taylor did that to disrespect Mumford

---

[17] Trial Transcript at N-145-149 (October 26, 2009).

[18] Court Ex. N.9 at 14.

because she had disrespected him. You can not separate Taylor's motive for murdering Mumford from his motive for abusing Mumford's corpse. Taylor's need to be respected links the murder and abuse charges together and makes the trial of them together appropriate.

Unfair Prejudice

Taylor, regardless of the cucumber photographs, was already in a difficult position. The State charged Taylor with Capital Murder. Capital Murder is the most serious of crimes because it involves the taking of a human life under the worst of circumstances. Capital Murder is a Class A felony punishable by death. Abusing a Corpse is a far less serious crime. A person is guilty of abusing a corpse "when the person treats a corpse in a way that a reasonable person knows would outrage ordinary family sensibilities."[19] It is a crime of disrespect. Abusing a Corpse is a Class A misdemeanor punishable by up to one year in jail.

The facts surrounding murders are always terrible. The facts surrounding capital murders are even worse. This murder was no different. Taylor was, from the very beginning and regardless of the cucumber photographs, going to appear before the jury in a most unfavorable light. The evidence in this case established that four days before Taylor and Mumford were to be married, a stressed-out and put-upon

---

[19] 11 *Del. C.* §1332.

Taylor beat Mumford to death in the house they shared because she disrespected him in front of his friends, leaving her naked body on the bathroom floor to be found by her children. Taylor's defense to this was the unlikely combination of self-defense and accidental fall. Taylor stated that he hit Mumford with the frying pan to defend himself from her knife attack and then engaged in a one-sided fight with her in the kitchen. Taylor stated further that Mumford was injured in a fall down the stairway when she jumped on his back to prevent him from leaving the townhouse after he hit her with the frying pan. One might have thought that Mumford would have been relieved to have Taylor leave the townhouse after getting beaten with the frying pan and bounced around in the kitchen. And then, according to Taylor, Mumford fell down the stairway and crashed her head into the wall so hard that it caused blunt force trauma to her head that ultimately killed her. This was terrible and senseless and certainly caused the jury to not look fondly on Taylor. The cucumber photographs were, quite frankly, inconsequential compared to the evidence supporting the murder charge and could not have put Taylor in a more unfavorable situation than he was in to begin with.

I have concluded that joinder was logically and legally proper and severance was not warranted. I find that the jury did not cumulate the evidence of the murder and abuse charges and find Taylor guilty of murdering Mumford when, if considered

34

separately, it would not have done so. There was a lot of very persuasive evidence supporting the murder charge. Taylor and Mumford were alone in the townhouse arguing with each other. Taylor is a big man. Mumford is a small women. The townhouse was the scene of an obvious fight. Mumford's clothing, hair, dentures, and fake fingernails were strewn all over the place. Nothing of Taylor's was found there. Mumford was battered, bruised, bloodied and dead. Taylor did not have a scratch on him. Mumford was found naked and dead in the townhouse. Taylor was found by the police four days later in Washington, D.C. When Taylor was interviewed by Detective Porter, he spoke of violence and rage and the need to be kept away from other people while in jail. It is not hard to put the pieces of this puzzle together. They are all there and support the jury's verdict that Taylor beat Mumford to death. It was not a close case on the murder charge. The cucumber photographs did not tip the scales against Taylor on the murder charge.

I also find that the jury did not look at the evidence supporting the abuse charge and find that Taylor had a general criminal disposition to commit murder. There was simply no rational reason for the jury to have done so. There were only three charges. Each charge was different. The jury certainly was not overwhelmed by the number of charges.

And lastly, I find that Taylor was not subject to embarrassment because he had

35

different or confusing defenses to the murder and abuse charges. Taylor defended the murder charge by arguing self-defense and accidental fall. Taylor defended the abuse charge by arguing that Mumford was alive and had engaged in consensual sexual activity with the cucumbers while he took photographs of her. Taylor's defenses to the two charges simply could not be logically separated because no one would have believed that Mumford would have wanted to have sex with Taylor after the fight in the kitchen and the "fall" down the stairway. The events of that night could not be parsed out as Taylor wishes. The cucumber photographs were useful in proving the murder and abuse charges and in undermining all of Taylor's defenses. That was Taylor's problem. The cucumber photographs made his defenses seem implausible. The jury found Taylor guilty of murder because of the overwhelming evidence against him and the implausible nature of his defenses.

Taylor's Authority for Severance

The cases that Taylor relies upon are not persuasive authority for his argument against joinder and for severance. *Monceaux*[20] and *Drummond*[21] each involved defendants who were convicted sex offenders who had been charged with new sex offenses involving a child victim. Each defendant was charged with the new sex

---

[20] *State v. Monceaux*, 51 A.3d 474 (Del. 2012).

[21] *State v. Drummond*, 56 A.3d 1038 (Del. 2012).

charges and a charge of Sex Offender Unlawful Sexual Contact Against a Child.[22] The underlying conduct in each case that gave rise to the new sex charges had no factual relationship whatsoever to the fact that the defendant was a convicted sex offender. That is not the case here. Taylor's abuse of Mumford's corpse is part and parcel of his murder of her. The murder and abuse charges both involved Taylor and Mumford and occurred in the same place at about the same time. The fact that a defendant is a convicted sex offender is highly prejudicial and has no probative value in proving the new sex charges. The Supreme Court dealt with these types of cases by holding that they must be resolved with a bifurcated trial. The new sex charges are presented to the jury first. If the jury convicts the defendant on the new sex charges, then the issue of whether the defendant is a convicted sex offender is presented to the jury.

*McGraw*[23] does not support Taylor's argument either. McGraw was charged with 31 counts of Dealing in Child Pornography and two counts of Unlawful Sexual Contact in the Third Degree. The police found child pornography on McGraw's personal computer at his home. McGraw was alleged to have touched his niece on her breasts and buttocks while she was resting on a couch at his home. In this case,

---

[22] 11 *Del. C.* §777A.

[23] *State v. McGraw*, 2002 WL 1038823 (Del. Super. May 16, 2002).

other than all the counts involving McGraw, there was no connection between them. There was no allegation that McGraw showed child pornography to his niece while fondling her. The trial court granted McGraw's motion to sever, reasoning that the charges were never properly joined in the first place because the charges were not of the same or similar character and were not a part of the same act or transaction. This alone would have justified severance. The trial court also found prejudice, reasoning that the child pornography charges would lead the jury to find McGraw guilty of the sexual contact charges. That is not the case here because the cucumber photographs were a part of a series of connected events and very helpful in proving the murder charge.

Inextricably Intertwined

Taylor's abuse of Mumford's corpse was a part of that tragic night that just can not be left out. In murder trials, as in many other crimes involving physical violence among domestic partners, there is always a beginning and an ending. The ending always involves a deceased victim and often a fleeing defendant. That is usually the logical place for the end of the evidence. The beginning is often more complicated and usually involves the issues of unfair prejudice. Murders involving domestic partners almost never start with the act that causes the victim's death. There is usually a long history surrounding the murderer and victim that must be explained in

order to put the murder in the proper context. Did the murderer and victim argue for weeks or months before the murder? Was there a history of escalating arguments and violence? If so, how far back in time do you go? These things are often prejudicial, but usually very relevant. This case is no different. It did not start with an argument over dinner. It goes back much further than that. Taylor was, for some time, worried about money and having doubts about whether he wanted to go through with the wedding. Taylor was also a proud man who viewed himself as a highly accomplished craftsmen who played an important but underappreciated role in his employer's success. Mumford did not respect the fact that Taylor's job was demanding and that he "paid the bills." That was the backstory that helps to put the argument between Taylor and Mumford over dinner in front of Taylor's friends and the murder and abuse charges in context. Taylor was a proud man who was not properly respected at work or home. None of that was prejudicial at all. While there may be some doubt about the beginning of a murder, there is usually no doubt about the middle and the end. You never leave out things that happened after the beginning but before the end. If you do, then you have altered the reality of what happened. Once you do that, then you can have unintended consequences. For example, in this case, if the cucumber photographs had been left out, either as proof of the abuse charge or in rebuttal to Taylor's defenses, would Taylor have testified that he and Mumford had sex with

39

cucumbers after she sustained the injuries that eventually caused her death a few hours later. I suspect not given Taylor's position now. Yet, at trial, if you believe Taylor, it showed that Mumford did not hold him responsible for her injuries. It was, one way or the other, all her fault. Thus, the cucumber photographs were very important. Of course, leaving the cucumber photographs out would have made it possible for Taylor to leave out the story about Mumford getting sexually aroused and wanting to have sex with him. This would have prevented the State from forcefully attacking Taylor's credibility by arguing that his testimony regarding both defending himself from Mumford's alleged knife attack and Mumford's alleged fall down the stairway was fabricated because it simply would not have made sense for Mumford to have wanted to have sex with Taylor after the fight in the kitchen and the hard fall down the stairway. That was simply never going to happen. Quite simply, the cucumber photographs forced Taylor to come up with a preposterous story that was just not believable and destroyed his credibility. Thus, the cucumber photographs had relevance far beyond just proving the abuse charge. One way or another, the cucumber photographs were going to be evidence in this case.[24]

## Jury Instruction

I gave the following jury instruction regarding the manner in which the jury

---

[24] *Ruiz v. State*, 820 A.2d 372 (Del. 2003) (TABLE).

was to consider the three charges before it:

> Now, upon retiring to the jury room, I suggest that you carry on your discussions in an orderly way and give everybody an opportunity to express their views before taking a vote or attempting to decide the case. All the issues should be fully and fairly discussed and everyone should have a fair chance to be heard and participate. As I mentioned, all twelve jurors have to unanimously agree to your verdict.

> You must separately consider each count and must reach a separate verdict as to each count, uninfluenced by your verdict in any other count. Just because you reach a conclusion as to one count, it doesn't mean that the conclusion would apply to other counts.

> As to each count, if, after a careful and conscientious consideration of the evidence in the case, you believe beyond a reasonable doubt, as I have explained that expression to you, that the defendant, Emmett Taylor, committed the crime for which he stands charged in a particular count as that has been defined to you, your verdict should be "Guilty As Charge" of that count.

> However, if you do not find that all of the elements of the crime charged in a particular count have been proved beyond a reasonable doubt, or if you have a reasonable doubt concerning the guilt of the defendant as to a particular count, then your verdict must be "Not Guilty" of that count. Each verdict must be unanimous.

The purpose of this instruction was to tell the jury to consider each count separately and on its own merit. A jury is presumed to understand and follow the jury instructions.[25] I have no reason to believe that the jury did anything other than that in this case.

---

[25] *State v. Monroe*, 2014 WL 2581971, at *6 (Del. Super. June 6, 2014).

## Trial Counsel's Decision

Taylor's Trial Counsel initially planned to use a mental illness defense at trial. Trial Counsel believed that the cucumber photographs would support this defense. Taylor was initially on board with this defense, but ultimately decided to pursue a trial strategy of self-defense and accidental fall, making the cucumber photographs irrelevant from his point of view. Taylor's Trial Counsel did not file a motion to sever the abuse charge from the other two charges because they did not think that it would be granted. Taylor's Trial Counsel was correct. I would not have severed the abuse charge from the other two charges. Thus, I conclude that Taylor's Trial Counsel were not ineffective for not filing a motion to sever the abuse charge from the other two charges.

## Conclusion

I conclude that the joinder of the murder and abuse charges was appropriate and that severance was not warranted and that the introduction of the cucumber photographs into evidence did not unfairly prejudice Taylor's right to a fair trial.

## Argument 2

## Mi Jung's Credibility

Taylor makes four arguments regarding Mi Jung's trial testimony. Mi Jung lived in the townhouse next to Taylor and Mumford and testified about what she

42

heard the night Taylor murdered Mumford. Mi Jung gave a taped statement to Delaware State Police Detective Kelly Wells the day after the murder and was deposed by the parties before trial because at the time it was believed that she would not be available to testify at the trial. However, Mi Jung did testify in person at the trial. Mi Jung is Korean. Mi Jung did not use an interpreter when she spoke to Detective Wells. Mi Jung did use an interpreter for her deposition and trial testimony.

Taylor argues generally that Mi Jung was the State's star witness and that his Trial Counsel should have attacked her credibility. Mi Jung's husband also gave a statement to Detective Wells the day after the murder. However, Detective Wells did not get his name. Taylor's Trial Counsel tried to locate Mi Jung's husband, but were not able to do so. Taylor's Trial Counsel believed that Mi Jung's testimony was largely consistent with the other evidence in the case. I agree that Mi Jung's testimony was consistent with the other evidence.

One, Taylor argues that his Trial Counsel should have identified and questioned Mi Jung's husband because the statement that he gave to Detective Wells allegedly conflicted with his wife's statement to Detective Wells, her deposition testimony, and her trial testimony. Mi Jung's husband told Detective Wells that he

43

had heard two male voices during the argument.[26]  Mi Jung testified that she only heard Taylor's voice during the argument.  Mi Jung's husband did not testify at trial.  Taylor argues that Mi Jung's husband's statement is important because it conflicted with Mi Jung's trial testimony and shows that the argument between Taylor and Mumford was two-sided.  Taylor also argues that his Trial Counsel should have called Mi Jung's husband to testify at trial.

Two, Taylor argues that his Trial Counsel should have used Mi Jung's conflicting statements to attack her credibility. Mi Jung allegedly made conflicting statements about whether her husband was home on the night of Mumford's murder.

Three, Taylor argues that his Trial Counsel should have used at trial Mi Jung's pre-trial statement about allegedly seeing Mumford alive at 11:30 p.m. because it conflicted with the State's theory that Mumford was allegedly incapacitated by 11:00 p.m. and dead by 12:32 a.m.  Mi Jung allegedly said during her interview with Detective Wells that she saw Mumford outside the townhouse at 11:30 p.m.  Mi Jung did not testify to this at trial, stating only that she saw one person outside the townhouse and could not tell who it was.  Mi Jung said during her deposition that it was her husband that saw two people outside the townhouse.  However, Mi Jung did not say at what time her husband said he saw the two people outside the townhouse.

---

[26]  In Korean you can not tell the gender.

Four, Taylor argues that the State's failure to get Mi Jung's husband's name and turn it over to Taylor's Trial Counsel was a *Brady* violation and that his Trial Counsel should have pursued a *Brady* violation.

Whether the argument between Taylor and Mumford was one-sided or two-sided and the time of Mumford's death were at issue in this case. Taylor argues that the State relied, at least in part, on Mi Jung's testimony to show that the argument between Taylor and Mumford was one-sided and that Mumford was dead at 12:32 a.m. Whether the argument was one-sided or two-sided is arguably relevant because it relates to Taylor's self-defense testimony. The time of Mumford's death was relevant because the State needed to prove that Mumford was dead at 12:32 a.m. when Taylor put the cucumbers in her vagina and rectum in order to prove the abuse charge. The State used Mi Jung's testimony and the cucumber photographs and other evidence to prove that Mumford was dead at 12:32 a.m. The State argued that Mumford was dead when the cucumber pictures were taken at 12:32 a.m. Mi Jung testified that she only heard Taylor's voice during the altercation and that the altercation started around 10:00 p.m. to 10:30 p.m. and lasted more than 30 minutes. Mi Jung's testimony meant that the fight was over around 11:00 p.m. The cucumber photographs were taken by Taylor at 12:32 a.m. The State argued that the fight was over around 11:00 p.m. and that Mumford was dead at 12:32 a.m. Taylor testified

45

that both he and Mumford argued and fought and that she was alive when he put the cucumbers in her vagina and rectum and that he did not find her dead in the bathroom until 3:00 a.m. to 4:00 a.m. I will set forth Mi Jung's husband's statement and the applicable portions of Mi Jung's statements and then address Taylor's arguments.

Mi Jung's Husband's Statement To Detective Wells[27]

[Mi Jung's husband] stated that he came home from work that night [August 13, 2007] around 2010 hours and saw 3 men sitting in a small dark green car outside Stephanie's residence. He noticed it was Emmett and 2 other black males. He said hi to Emmett and noticed all three were huddled in the car. He said that while he was inside the house he heard movement from Stephanie's house, sounds like furniture being moved. He said he heard scratching sounds and something being dragged on the floor. He said that before the dragging sounds he heard grunting and 2 male voices talking. He described the grunting sound like someone being punched.

Mi Jung's Husband's Statement to Mi Jung

Mi Jung stated during her deposition that it was her husband, not her, that saw two people outside the townhouse. Mi Jung said that her husband told her this the day after the murder when she was sitting by her garage crying after she had spoken to Detective Wells.[28]

Mi Jung's Trial Testimony[29]

Mi Jung lived in the townhouse next to Taylor and Mumford's townhouse. Mi Jung was in her living room watching a movie on her

---

[27] This is from Detective Wells' police report.

[28] Deposition of Mi Young Jung at 26-27 (June 17, 2008).

[29] This is my summary of Mi Jung's trial testimony

46

computer and listening to the sound through headphones. Mi Jung heard banging sounds coming from Mumford's townhouse around 10:00 p.m. to 10:30 p.m. Mi Jung took her headphones off, went into her bathroom and placed her ear to the wall to hear better. Mi Jung heard the banging start and stop and go on for about 30 minutes. Mi Jung heard Taylor say "get out of here" or "get out" more than once. Taylor was very loud and sounded angry. Mi Jung did not hear Mumford. Mi Jung looked out her window after the banging stopped and saw Mumford's white Tahoe. Mi Jung heard a door open. Mi Jung saw a person bending over. Mi Jung could not tell if it was a man or a woman. Mi Jung then went to bed for the night. Mumford's white Tahoe was gone when Mi Jung looked out in the morning.

## Mi Jung's statement to Detective Wells[30]

She asked me what I knew. I told her a big noise last night around 2230 hours until 2400 hours. At 2400 she heard ...sound and looked out her window and saw a car leave from Stephanie's parking place. Stephanie's car was parked in front of the garage. She thought Emmett left. She said at 0800 hours this morning she checked outside and Stephanie's car (white SUV) was gone. She thought that Stephanie went to work at the Walmart as usual. She said that they fought several times badly. The next day they were always happy. She told Samantha that someone left at 2400 hours. She said it was a small dark car. She said that before the small car left she heard the slamming door of Stephanie's car (around 2330). She was sitting on the couch and looked out of the window. There were 2 people, one was tall and one was shorter. The car door slammed 2 times. At 2300 hours, she went outside to check and see what happened. When she came out the garage door was open and the 3rd floor right side light was on and the second floor the livingroom was on but a little dark (small light was on). She did not call the police because it was not the first time they argued.

---

[30] This is from Detective Wells' police report.

## Detective Wells' Handwritten Notes

11:30 p.m. heard slamming door at Steff's car.

"Emit is Tall" Another Male – shorter"

Steff

Slammed the door twice

## Transcript of Mi Jung's Taped Statement to Detective Wells[31]

Mi Jung heard a chopping noise at 10:30. Around 12:00 a.m. Mi Jung heard a car sound and looked through her window and saw a car leaving from the parking space. The parking space was where Taylor usually parked. Taylor saw Mumford's car in front of the garage. Mi Jung thought that Taylor left after the fight.

Mi Jung woke up at 8:00 a.m. the next day and saw that Mumford's car was gone.

Mumford's car is an SUV and was there at 12:00 a.m. the night before.

There was a small car in the other parking space. The small car was dark in color.

Mi Jung heard the slamming of Mumford's SUV before the small car left. Mi Jung looked out to see. Mi Jung did not think it was Taylor because he is very tall. Mi Jung could not see Taylor. Mi Jung could not see the smaller one's face.

Mi Jung assumed the smaller one who slammed the door was Mumford because the body was much small than Taylor.

---

[31] This is my summary of Mi Jung's statement transcript.

48

Mi Jung was not sure if it was another male or Stephanie.

Mi Jung stated, when asked "[a]nd that was at what time?" Stated 10:30 p.m. and the sounds start at 10:30 p.m. 11:00 p.m.

Mi Jung heard a banging noise start at 10:30 p.m. Mi Jung heard a man yelling and only heard one word. Mi Jung did not hear Mumford's voice.

Mi Jung thought the voice was Taylor's because it sounded like him.

Mi Jung did not hear the whole thing because she was watching a movie on her computer and was listening through headphones because her daughter and niece were sleeping in the living room.

Mi Jung's Deposition[32]

Mi Jung heard banging noises about 10:00 or a little after 10:00 p.m. The banging started and stopped and lasted one hour or more. Mi Jung was watching a movie on her computer. Mi Jung put her ear to the wall. Mi Jung heard Taylor say "get out of here" two or three times. Mi Jung did not hear Mumford. Mi Jung said it sounded like they were fighting or arguing. Mi Jung went outside. The garage door was open in Mumford's condo and the lights were on. Mi Jung did not hear anything else and went inside her condominium. Mi Jung resumed watching her movie. Mi Jung heard someone opening and closing Mumford's car door. Mi Jung looked out and saw someone opening her passenger door and doing something and then closing the door. When Mi Jung was asked about telling Detective Wells that she had seen "two people, one was tall, one was shorter," Mi Jung said that is not what she saw, but that is what her husband saw. Around 12:00 or 12:30 Mi Jung saw a car leaving. Mi Jung saw a green colored car pulling out of their parking spot. Mi Jung thought Taylor was leaving after the fight. Mi Jung did not see who was leaving. Mi Jung then went to bed. Mi Jung

---

[32] This is my summary of Mi Jung's Deposition.

got up at 8:00 a.m. the next day and saw that the garage door was closed and that Mumford's car was gone. Mi Jung saw the small car parked in the same spot later with some of Mumford's mail in it. After Mi Jung was done talking to Detective Wells, she was sitting in front of the garage. Mi Jung's husband came home from work and told her that he saw two people the day before. Mi Jung saw a green car leaving at midnight. This was after the door alarm. Mi Jung's daughter and niece were sleeping. Mi Jung said her husband was working the night shift. Mi Jung put her headphones on and off. Mi Jung took off the headphones when she heard something. Mi Jung put them back on when it got quiet. The green car was not there in the morning.

Argument I

One or Two Voices

Detective Wells reported that Mi Jung's husband heard "2 male voices" during the commotion at the townhouse on August 13, 2007. Mi Jung stated, in her statement to Detective Wells, in her deposition testimony, and in her trial testimony, that she heard only Taylor's voice during the commotion at the townhouse on August 13, 2007.

Taylor argues that Mi Jung's husband's statement that he heard "two male voices" conflicts with Mi Jung's statement that she heard only one voice and shows that the argument between Taylor and Mumford was two-sided. Taylor argues that this is important because it supports his trial testimony, particularly his self-defense testimony. I do not place much stock in the fact that Mi Jung's husband heard

50

Mumford but that Mi Jung did not hear her. I simply do not see how it affects Mi Jung's credibility at all. Taylor was hollering loud enough for Mi Jung to hear him. Mumford may not have been. Mi Jung was watching a movie on her computer in her living room wearing headphones so that she would not bother her sleeping daughter. Mi Jung told Detective Wells that she did not hear everything because of that. When Mi Jung first heard the banging next door, she had to take the headphones off and go into her bathroom and put her ear to the bathroom wall to hear what was going on next door.

I note that Mi Jung's husband's statement is not entirely consistent with Mitchell's testimony. Mitchell testified that Mumford called him three times that night and told him that Taylor had called her a "whore" and told her to get out of the townhouse. Mitchell testified that the last time Mumford called him he could hear Taylor in the background saying that he did not care. The context seems to be that Mumford was telling Taylor not to holler so loud because Mitchell could hear him over the phone and that Taylor said he did not care about being heard. This makes the argument between Taylor and Mumford sound one-sided with Taylor being the one hollering loud enough to be heard by Mi Jung through the wall and Mitchell over the phone.

In any event, the fact that Taylor and Mumford may have been arguing at the

51

time is hardly startling or of any consequence. Gibbs and Perez testified that Taylor and Mumford argued in front of them. Mitchell testified that Mumford told him over the phone that she and Taylor had been arguing. The point that Taylor wants to make now was already in evidence. Taylor and Mumford had argued earlier in the evening and may have continued arguing after Taylor's friends left. Taylor was certainly mad at Mumford for disrespecting him in front of his friends. Mumford may well not have been happy with how Taylor had treated her in front of them either.

Taylor argues that the fact that he and Mumford were arguing and that Mi Jung's husband heard them arguing supports his self-defense argument. The problem with Taylor's argument is that he did not believe his own self-defense argument. This is reflected in Taylor's statements to Detective Porter. The following is an excerpt of their exchange on this subject:

WP: vaguely. Do you remember if she was saying anything to you during this fight?

ET: Only thing I remember realistically...is me walking to the sink and she was cutting up something...opening something with a knife and I went to the sink to get ice or something – or a glass or I don't remember and she turned around and she had the knife and I just instantly grabbed her wrist. <u>And not that, I not saying that she did it intentionally</u>,

WP: Right.

ET: you know what I'm saying.

52

WP: <u>She turned with a knife...I mean she's not saying, "Emmett I'm gonna kill you" with a knife, you're just saying she turned with a knife.</u>

ET: I think that she might have felt that I was upset. Because if I had told her to go ahead wherever you're going, wherever you been, whatever you have been doing, I said go back and do it. You know what I'm saying? And I...we was basically...I was joking with her. I think that she became mad because to me it was funny but it wasn't funny, I was just trying to be humorous and just try to make the rest of the week man[33].

Taylor himself acknowledges that Mumford did nothing more than turn towards him with the knife that she was using to prepare his dinner and that she did not say anything threatening to him. Taylor's own words undermine his own self-defense argument. Taylor told Detective Porter that it was a one-sided fight. There is no doubt that it was. Taylor was 6'4" and 250 lbs. Mumford was 5'3" and 137 lbs. Taylor is a big man that lifted heavy fireplace pieces as part of his job. Mumford was a small woman that sold jewelry in a Walmart. The other evidence established that the fight clearly was one-sided. Mumford's body was battered, bruised and bloodied. Mumford died from her injuries. Taylor's body did not have a scratch on it. The stairway and surrounding area were littered with Mumford's hair, dental appliance, fake fingernails and clothes. Taylor did not lose a piece of clothing in the fight.

---

[33] Court Ex. N.9 at 18.

Interestingly, even though Mumford allegedly had a knife, she was the one who was badly beaten while Taylor did not have a scratch or cut on him. Even if Taylor and Mumford were arguing, it does not matter because (1) there already was trial testimony by Mitchell that Taylor and Mumford were arguing at the time, and (2) it does not make Taylor's self-defense argument more credible and it does nothing to impeach Mi Jung's credibility. Mi Jung's husband's testimony about hearing two people arguing would not have helped Taylor.

## Argument II

## Mi Jung's Husband Home or Not

Mi Jung testified that she talked with her husband about what each saw on the night of August 13, 2007. Taylor argues that this confirms that both were at home during the altercation. Taylor argues that Mi Jung did not tell Detective Wells this and in her deposition she testified that her husband was working the night shift on the night of August 13, 2007. Taylor argues that this shows Mi Jung's husband was an important witness because he was there during the altercation and that his Trial Counsel should have used these conflicting statements to impeach Mi Jung's credibility. I think Taylor's argument about Mi Jung's statement to Detective Wells is just wrong. Simply because Mi Jung did not tell Detective Wells that she and her husband had talked about what happened the night before means nothing. Moreover,

54

Mi Jung testified at her deposition that after she spoke to Detective Wells that she was sitting in front of her garage crying when her husband came home from work and told her that he saw two people the day before and that is what he told Detective Wells. I think Mi Jung's husband did see two people. I think he saw Gibbs and Perez leaving the townhouse around 10:00 p.m. I also think Detective Wells misunderstood Mi Jung and her husband when she interviewed them. Mi Jung's testimony when she used an interpreter is much easier to understand than her testimony when she did not. I believe Detective Wells mistakenly attributed Mi Jung's husband's statement about seeing two people to Mi Jung. I also think Detective Wells was just confused about Mi Jung's husband not being in the townhouse on the night that Taylor murdered Mumford. Mi Jung testified at her deposition that the next day she spoke to her husband when he came home from work. Taylor has turned this into Mi Jung's husband not being there on the night of the murder. That is simply not what Mi Jung said. Lastly, Mi Jung's husband's statement does not conflict with the other evidence. Thus, his statement is not helpful to Taylor. Mi Jung's husband stated that he saw Taylor and two black males sitting in a car outside the townhouse around 8:10 p.m. That would likely be Taylor, Gibbs and Perez sitting in a car outside the townhouse before they went inside the townhouse. That makes sense because Taylor, Gibbs and Perez went to the townhouse in the same car. Mi Jung's husband said that

he saw two people outside the townhouse. That would most likely be Gibbs and Perez leaving around 10:00 p.m. And if Mi Jung's husband heard Taylor and Mumford arguing, it was not anything new. Gibbs and Perez testified that Taylor and Mumford argued in front of them. Mitchell testified that Mumford told him on the phone that she and Taylor had been arguing. The problem is that during Mumford's last call to Mitchell, Mumford was trying to be quiet while Taylor didn't care if Mitchell heard him hollering. This made the argument sound one-sided. The fact that Mumford's phone went dead before she finished talking to Mitchell is ominous. None of this would have affected Mi Jung's credibility because everything Mi Jung's husband said is consistent with the other evidence in the case and that evidence is also consistent with Mi Jung's testimony. Mi Jung's husband was simply not a witness that was going to help Taylor.

Argument III

One or Two People Outside Around 11:30 p.m.

The following is a summary of Taylor's argument about Mi Jung seeing one or two people outside the townhouse at 11:30 p.m.

1. Told to Detective Wells – Mi Jung allegedly told Detective Wells that she heard Stephanie's (white) car door slam around 11:30 p.m. so she looked out the window and saw two people, one tall, one short at the car. In her hand written notes,

56

Detective Wells reported that the shorter person was "Steff."

2. <u>Taped Interview</u> – In her taped interview, Mi Jung allegedly confirmed that she assumed she saw Stephanie slamming her car door.

3. <u>Detective Wells Written Report</u> – In Detective Wells' written report Mi Jung allegedly puts the time of that event at 11:30 p.m.

4. <u>Deposition</u> – Mi Jung testified at her deposition that she did not see two people, only one, and that it was her husband who saw two people and that the car door closing occurred much after the banging noise she heard. Mi Jung, during her deposition, stated that she heard a car door opening and closing and went to the window to see what was going on and saw one person open the passenger side of the car and reach inside the car and do something. Mi Jung, during her deposition, stated that she and her husband talked the next day about what happened and that her husband told her that he saw two people, one was tall and one was shorter.

5. <u>Trial</u> – At trial, Mi Jung repeated her claim that she only saw one person at the white car.

Taylor argues that his Trial Counsel did not challenge Mi Jung on the contradiction between her statement to Detective Wells and her deposition and trial testimony even though Detective Wells was available to testify as to what Mi Jung told her. Taylor further argues that evidence that Mumford was alive and mobile at

11:30 p.m. on the night of the fight materially conflicts with the State's theory of the case that Mumford was incapacitated by 11:00 p.m. and deceased when Taylor took the cucumber photographs at 12:32 a.m. Taylor also argues that Mi Jung's testimony would have provided independent corroboration of his account of what happened in the hours before Mumford's death.

I find no merit to this argument for three reasons. One, Taylor's argument conflicts with his statement to Detective Porter and his own trial testimony. Taylor did not tell Detective Porter that he and Mumford fell down the stairway. Taylor did not tell Detective Porter that after he and Mumford fell down the stairway that they went into the garage where he washed the blood out of her hair. Taylor also did not tell Detective Porter that he and Mumford then went back in to the townhouse, walked up the stairway and had sex with the cucumbers. Taylor also did not tell Detective Porter that he and Mumford went out to her car around 11:30 p.m after they fell down the stairway. Taylor testified at trial that after he and Mumford fell down the stairway that he took Mumford into the garage to wash the blood out of her hair. Taylor testified that when he was done, he and Mumford went back into the house and walked up the stairway and had sex with the cucumbers. Taylor did not testify at trial that he and Mumford went out to her car at 11:30 p.m. I can not take Taylor's argument seriously when it does not appear anywhere in his statement to Detective

58

Porter and is contradicted by his own trial testimony.

Two, Mi Jung did not say that she saw Taylor and Mumford at her car at 11:30 p.m. Mi Jung, during her deposition, testified that she went outside and saw that Taylor's garage door was open. Mi Jung, in her statement to Detective Wells, said she went outside around 11:00 p.m. Mi Jung said she then went back inside. Later on that evening she heard and saw someone who she could not identify opening and closing Mumford's car door around 11:30 p.m. Mi Jung said that it was her husband and not her that saw two people outside. Mi Jung's husband certainly could have seen two people leaving Taylor's townhouse around 10:00 p.m. That would most likely be Gibbs and Perez. That is the only version that fits the statements made by Mi Jung's husband, and the testimony of Taylor, Mi Jung, Gibbs and Perez. Taylor has just taken a statement actually made by Mi Jung's husband and portions of Mi Jung's statements to argue that it was Mi Jung who saw two people outside at 11:30 p.m. That is not what Mi Jung said and it is not what happened. It was Mi Jung's husband who saw two people outside, but it was not at 11:30 p.m. It was most likely around 10:00 p.m. when he saw Gibbs and Perez leaving. That is the only version that makes sense. There is simply no evidence supporting Taylor's argument. Indeed, Taylor's trial testimony does not support his argument. Mi Jung's husband could not have seen Taylor and Mumford going to her car at 11:30 p.m. because

Taylor never said that they did. Taylor only said they went out to the garage to wash blood out of Mumford's hair and that they went back inside the townhouse after they had done that. Taylor did not testify that they walked out to Mumford's car at that time.

Three, Mi Jung's husband told her that he told Detective Wells that he saw two people. However, Mi Jung's husband did not put a time on it. Given that Taylor never said that he and Mumford went to the car after the fight and alleged fall down the stairway there is nothing to this. All that Mi Jung's husband saw was Gibbs and Perez leaving the townhouse around 10 p.m. That is not helpful to Taylor.

I note that Mi Jung is Korean, but does speak English. Mi Jung was more comfortable using an interpreter. Mi Jung did not have an interpreter when she spoke to Detective Wells. Mi Jung did have an interpreter at her deposition and trial. After reviewing Mi Jung's taped statement, her deposition, and her trial testimony, it is obvious that her deposition and trial testimony are much clearer than her recorded statement. I believe this accounts for the alleged discrepancies that Taylor has relied upon and explains Detective Wells's incorrect reporting of what Mi Jung told her.

Argument IV

The Missing Husband's Statement (*Brady*)

Mi Jung's husband told Detective Wells that he heard two voices during the

60

altercation. Detective Wells never got his name. Taylor argues that this was *Brady* material because it was evidence that the argument was two-sided and conflicted with Mi Jung's testimony that she only heard one voice. Taylor also argues that if Mi Jung's husband saw two people, one smaller than the other (presumably Mumford according to Mi Jung) it was *Brady* material because it supported Taylor's account of what happened and contradicted Mi Jung's deposition and trial testimony. The State has an obligation to produce exculpatory material to the defense under *Brady*. In order to establish a *Brady* violation, the defendant must establish three things. One, the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching. Two, that evidence must have been suppressed by the State, either willfully or inadvertently. Three, prejudice must have ensued.[34]

Taylor argues that Trial Counsel should have pursued a *Brady* violation. Taylor argues that this matters because he was unable to effectively cross-examine Mi Jung, a key State witness whose testimony established the time frame for the alleged murder, the predicate for the abuse charge. Taylor argues that Mi Jung's husband's statement that he heard two voices during the fight and that Mumford was allegedly alive and mobile at 11:30 p.m. after the sounds of the fight had ended

_____

[34] *Norman v. State,* 968 A.2d 27 (Del. 2009).

substantiates Taylor's claim that Mumford was alive for a much longer period of time than the State would have had the jury believe. Given the nature of this case, had the missing *Brady* material been provided, and Mi Jung effectively cross-examined, Taylor argues there is a reasonable probability that the outcome of the trial would have been different because the evidence would have provided independent corroboration of Taylor's account of what occurred in the hours before Mumford's death.

I disagree. I have concluded that there was no *Brady* violation. There is nothing about Mi Jung's husband's statement that is favorable to Taylor or impeaches Mi Jung's credibility. Mi Jung's husband gave a statement about three things. One, Mi Jung's husband saw Taylor and two people in a car, which is not disputed. Mi Jung's husband saw Taylor, Gibbs and Perez sitting in a car before they went into the townhouse. There is nothing about this that is either favorable to Taylor or impeaches Mi Jung's credibility.

Two, Mi Jung's husband heard two people arguing, which is also not disputed. Gibbs and Perez testified that Taylor and Mumford argued in front of them. Mitchell testified that Mumford told him over the phone that she and Taylor had been arguing. That evidence was already in front of the jury. Taylor argues that the fact that the argument was two-sided is important because it helps his self-defense argument.

There are a number of problems with this argument. As I discussed before, this did not advance Taylor's self-defense argument because he undermined it with his own words. Taylor acknowledged in his interview with Detective Porter that Mumford, when she was holding the knife, did nothing more than turn around towards him and that she did not say anything threatening. Taylor and Mumford may well have been engaged in a two-sided argument, but the fight between them was, in Taylor's own words, certainly a one-sided fight. Mumford was battered, bruised, bloodied and dead. Taylor did not have a scratch on him and is very much alive. I also explained before why Mi Jung may not have heard Mumford arguing. Mi Jung was watching a movie and wearing headphones. Mi Jung had to remove the headphones and go into her bathroom and put her ear against the wall to hear what was going on next door. Mi Jung took her headphones off and put them back on from time to time. That certainly explains why her husband may have heard Mumford, but she did not. There is nothing about this part of Mi Jung's husband's statement that is favorable to Taylor or impeaches Mi Jung's credibility.

Three, Mi Jung said it was her husband who saw two people outside the townhouse, not her. As I have discussed before, the two people that he most likely saw were Gibbs and Perez leaving the townhouse around 10:00 p.m. Taylor did not testify that he and Mumford walked out to her car after he washed the blood out her

63

hair around 11:30 p.m. Taylor testified that after he and Mumford fell down the stairway that they went from the house to the garage, washed the blood out of Mumford's hair, and then went back inside the townhouse. Quite simply, Taylor's own testimony contradicts his argument. There is nothing about this part of Mi Jung's husband's statement that is favorable to Taylor or impeaches Mi Jung's credibility. Thus, Taylor can not satisfy the first and third of the three necessary requirements to establish a *Brady* violation. Mi Jung's husband was just not going to be a helpful witness for Taylor.

## Trial Counsel's Position

Trial Counsel made an effort to identify and locate Mi Jung's husband. Trial Counsel asked the State about him and was told that he and Mi Jung were separated and that they had moved out of Delaware and did not know where. Trial Counsel sent an investigator to the neighborhood where Mi Jung and her husband lived to talk to neighbors in an effort to identify him. However, the investigator was not able to do so. Trial Counsel did not ask Mi Jung her husband's name or whereabouts. Trial Counsel thought that Mi Jung's statements were largely consistent with the other witnesses and that the discrepancies in the timeline of events were of little consequence, particularly since none of the witnesses were keeping track of time and that such things often vary among witnesses. I agree.

Mi Jung's testimony is consistent with the other evidence. Mi Jung testified she heard banging and arguing around 10:00 p.m. to 10:30 p.m. That is consistent with the time that Gibbs and Perez testified that they left the townhouse. It is also consistent with Mumford's phone going dead the last time that she called Mitchell around 9:45 p.m. Mi Jung said that the fight lasted more than 30 minutes. This put the end of the fight around 11:00 p.m. There is no evidence that contradicts this. Indeed, the cucumber photographs establish that the fight was at least over by 12:32 a.m. Taylor told Detective Porter that he and Mumford argued and engaged in a one-sided fight. The townhouse is the scene of an obvious struggle. The kitchen is a mess. There was a broken planter and blood all over the place in the kitchen. There were dents in the drywall at the landing and base of the stairway going from the second floor to the first floor. Thus, Mi Jung's testimony about hearing Taylor hollering and banging noises is supported by the testimony of Taylor, Perez, Gibbs, Mitchell and the other evidence.

I conclude that Taylor's Trial Counsel's failure to use Mi Jung's husband's statement did not unfairly prejudice Taylor's right to a fair trial.

<u>Argument 3</u>

<u>The Frying Pan</u>

Taylor argues that his Trial Counsel failed to prevent the submission of an

65

"evidence bag mischaracterizing the murder weapon as bloody" to the jury. Detective Keith Marvel found the frying pan that Taylor admittedly used to hit Mumford with at the townhouse. Detective Marvel placed the frying pain in an evidence bag labeled "fry pan with blood." Detective Marvel labeled the bag this way because it appeared to him that the frying pan had blood on it. The frying pan was admitted into evidence at trial. The evidence bag and frying pan were given to the jury during its deliberations. Trial Counsel did not object because they were unaware of it. Because of this, Taylor argues that "[p]atently false evidence was used to convict" him of the charges of murder and possession of a deadly weapon during the commission of a felony. Taylor argues further that the State argued that he beat Mumford with the frying pan and that her death was caused by the beating. Thus, according to Taylor, characterizing the frying pan as bloody constituted material support for the State's case.

I disagree. Taylor's argument ignores the State's opening and closing statements to the jury, the evidence, and the instruction I gave the jury on what constitutes evidence. One, the State did not argue to the jury that the frying pan was the murder weapon. Two, the testimony that the jury heard was that the frying pan did not have blood on it. Three, I told the jury that its verdict "must be based solely and exclusively on the evidence in the case" and that evidence is the "testimony of

66

any witnesses and any exhibits that were introduced during the trial." The mislabeled bag was not evidence.

The State's Opening and Closing Statements

The prosecutor in her opening statement to the jury stated that Taylor brutally beat Mumford and that the cause of Mumford's death was blunt force trauma by multiple blows to her head and face. The prosecutor did not even mention the frying pan in her opening statement to the jury. The prosecutor in her closing statement to the jury argued that Mumford died as a result of blunt force trauma and that the blunt force could have been caused by a blunt object – a frying pan, a fist, a wall, or other flat surface. The prosecutor pointed out that as a part of the charge of Possession of a Deadly Weapon During the Commission of a Felony the State alleged that the weapon was the frying pan and that Taylor admitted that he struck Mumford once with the frying pan and may have struck her more than once. The prosecutor did not argue that Taylor beat Mumford to death with the frying pan to the exclusion of everything else. Indeed, it was Taylor himself who admitted to hitting Mumford with the frying pan, which he did to bolster his self-defense argument. The prosecutor in her rebuttal statement to the jury made it clear that the State did not have to prove that the frying pan caused the fatal blow to Mumford. The prosecutor told the jury that the fight just started with Taylor hitting Mumford with the frying pan. Taylor then,

according to the prosecutor, then beat Mumford all around the rest of the townhouse. The prosecutor made it clear it was not just the frying pan. The prosecutor went on to argue that the blunt force trauma that killed Mumford could have involved Taylor's fists, the frying pan, the drywall and anything else that could cause blunt force trauma. The prosecutor never told the jury that the frying pan had blood on it. Moreover, the trial testimony was that the frying pan did not have blood on it.

Detective Keith Marvel's Trial Testimony

Detective Marvel is an evidence technician with the Delaware State Police. He testified at trial as follows regarding the frying pan:

> Q. And I'm going to display what's been entered into evidence as State's Exhibit 42.
>
> A. Yes. This is a photograph of the kitchen floor. You see what I described as blood transfer patterns on the kitchen floor, as well as the jewelry bag and one half of a black bra.
>
> Q. I'm going to display what's been entered into evidence as State's Exhibit 43, and ask you to explain what's in that photograph.
>
> A. Yes. That is a photograph of the kitchen area with the island. There is a frying pan on top of the island; a broken, what I described as a planter, with dirt all over the floor. Some blood transfer on the cushion of the bar stools, and there is also transfers on top of the island countertop.
>
> Q. What is that in the center of the island counterop there?
>
> A. This is a frying pan.

Q. Did you collect any pieces of that planter and that frying pan?

A. Yes.

Q. I'm going to hand you what's in a bag and ask you if you can identify the contents.

A. Yes. This is what I described as pieces of the broken planter that are depicted in that photograph on the kitchen floor.

Ms. Ryan:    I'd like to offer this as the State's next exhibit.

THE COURT: Mr. Callaway?

MR. CALLAWAY: No objection.

THE COURT: Mark and admit it.

THE CLERK: Admitted as State's Exhibit No. 79.

BY MS. RYAN:
Q. I ask you to just remove a couple pieces of that planter and display them to the jury.

A. (Witness complied.)

Q. Thank you. I hand you another bag and ask you if you can identify this bag.

A. Yes. This bag contains the frying pan that's depicted in the photograph on the kitchen island.

MS. RYAN: I'd like to offer this as the State's next exhibit.

MR. CALLAWAY: No objection.

THE COURT: Mark and admit it.

69

THE CLERK: Admitted as State's Exhibit No. 80.

BY MS. RYAN:

Q. Can you display that item from the bag to the jury, please?

A. (Witness complied.)

Q. Did you send that frying pan for any additional testing?

A. Yes. It was also sent to the medical examiner's lab for DNA testing.[35]

Detective Marvel did not tell the jury that the frying pan had blood on it.

### DNA Expert Jennifer Van Zanten

Jennifer Van Zanten is a DNA case worker with the Office of Chief Medical Examiner of Delaware. She testified at trial as follows regarding the frying pan:

Q. I will hand you what has been entered into evidence as State's Exhibit 80.

A. This is DNA 07-1320 and this says, location of recovery: Top of island kitchen. And this is a frying pan.

Q. Did you conduct any preliminary testing on that item to determine whether or not there was any substances, any substances which were blood or human blood?

A. Yes. This did not have human blood on it.

Q. Did you conduct any further tests after you reached that

---

[35] Trial Transcript at K-159-161 (October 20, 2009).

result?

A.  No.  Once that test is done, there is no need to go further.[36]

Van Zanten told the jury that the frying pan did not have blood on it.

### The Jury Instruction

I gave the jury the following jury instruction:

### Verdict Based on Evidence

Your verdict must be based solely and exclusively on the evidence in the case. You cannot be governed by passion, prejudice, bias, sympathy, or any motive whatsoever except a fair and impartial consideration of the evidence. You must not, under any circumstances, allow any sympathy which you might have or entertain for anyone to influence you in any degree whatsoever in arriving at your verdict.

Evidence is the testimony of witnesses and any exhibits that were introduced during the trial. You will have the exhibits in the jury room during your deliberations. You should consider all of the evidence bearing upon every issue regardless of who produced it. While it is very important that you listen to and consider what the lawyers say and have said to you during their remarks to you, what they say or have said is not evidence. Further, even though you must follow what I say about the law, what I say or have said is not evidence.

The evidence in this case was that the frying pan did not have blood on it.  My jury instruction told the jury that its verdict must be based solely and exclusively on the evidence in the case and that evidence is witness testimony and exhibits that were

---

[36]  Trial Transcript at L-70 (October 21, 2009).

introduced during the trial. The frying pan – not the bag that it was in – was the evidence. I certainly believe that the jury knew that the bag was not evidence. It is worth noting that the frying pan was just a lightweight aluminum frying pan, not a heavyweight cast iron frying pan. The State never argued that the frying pan was the murder weapon to the exclusion of everything else. Indeed, the State argued that it had no such burden, stating that Mumford died as a result of blunt force trauma to her head and that many things could have caused that blunt force trauma. The State never argued that the frying pan had blood on it. Indeed, the State itself elicited the testimony that the frying pan did not have blood on it.

While I certainly agree that the evidence bag should not have gone back to the jury, I find that sending it back to the jury did not unfairly prejudice Taylor's right to a fair trial.

Argument 4

The Forensic Pathologist

Taylor argues that his Trial Counsel should have retained a forensic pathologist to determine the cause and manner of Mumford's death. Taylor argues that if his Trial Counsel had done so then they would have learned that Mumford sustained a fatal subdural hematoma when her head crashed into the wall at the base of the stairway. Taylor testified that Mumford accidently fell down the stairway while trying

72

to keep him from leaving the townhouse after he had hit her with the frying pan and they had fought in the kitchen over the knife. Taylor argues that his forensic pathologist's testimony would have supported his accidental fall defense.

The State's expert, Dr. Tobin, concluded that Mumford died from blunt force trauma to the head. However, Dr. Tobin was unable to conclude precisely what caused Mumford's fatal head injuries. Taylor's expert, Dr. Hameli, reviewed the evidence and also concluded that Mumford died from blunt force trauma to the head. However, Dr. Hameli was more specific than Dr. Tobin regarding the physiological cause of Mumford's death. Dr. Hameli concluded that the collision of Mumford's head with the wall at the base of the stairway caused the subdural hematoma that ultimately killed her by compressing her brainstem and causing her to stop breathing. According to Dr. Hameli, Mumford's head collided with the drywall, causing her brain to slam into her skull, resulting in the subdural hematoma. Dr. Hameli was unable to say whether Mumford's fall down the stairway was accidental or not. Dr. Hameli believes that Mumford lived for a couple of hours after the fall and that she was not dead when Taylor took the cucumber photographs.

Taylor uses Dr. Hameli's opinions to bolster his accidental fall defense and argues that if the jury had heard Dr. Hameli's opinion it would have likely acquitted him on all charges against him. Taylor argues that Dr. Hameli's opinion completely

rebutted Dr. Tobin's opinion and eviscerated the State's case. Dr. Hameli would have testified that the manner of Mumford's death was undetermined. Taylor reasons that since in this case there were multiple possible causes of Mumford's death it was incumbent upon his Trial Counsel to determine what actually caused her death.

I agree that Taylor's Trial Counsel should have retained a forensic pathologist to determine Mumford's cause of death. However, I have concluded that their decision not to do so ultimately does not matter.

The Manner of Mumford's Death

No one, other than Taylor, knows the manner of Mumford's death. Not Dr. Tobin. And not Dr. Hameli. However, the State's argument and the jury's finding that Taylor in some manner beat Mumford to death are supported by the evidence in this case. Moreover, it is worth noting that Taylor's trial strategy of self-defense and accidental fall makes Dr. Hameli's testimony irrelevant because they would, if believed, absolve him of any responsibility for Mumford's death because her injuries were caused by her own actions and misfortunes, threatening Taylor with a knife and jumping on his back to keep him from leaving the townhouse, respectively.

I also note that Dr. Hameli's finding that Mumford's collision with the wall at the base of the stairway caused her fatal head injury is hardly startling news and is certainly something that the jury probably considered in concluding that Taylor beat

Mumford to death by in some manner forcing her head into the wall at the base of the stairway. I say this because it appears that Taylor beat Mumford to death that way. The drywall at the base of the stairway had a dent in it and the drywall at the landing halfway down the stairway also had a dent in it. Mumford's hair, fake fingernails, dental appliance and clothes were on the stairway while nothing of Taylor's was on the stairway. Mumford was badly injured in the fall. Taylor was uninjured. Indeed, Taylor did not have a scratch on him. Thus, it certainly appeared that Taylor pushed or threw Mumford down the stairway instead of them both falling together.

Dr. Hameli's opinions do not matter because they rest on Taylor's testimony about Mumford's fall down the stairway. The jury rejected Taylor's testimony for good reason. Taylor's testimony about the accidental fall was not believable because: (1) Taylor never told Detective Porter that Mumford fell down the stairway in an effort to prevent him from leaving the townhouse after they fought in the kitchen; (2) Taylor's statements to Detective Porter are basically the confession of a guilty man who recognizes that he is full of rage and that he is too dangerous to be around other people; (3) Taylor's trial testimony appears to be a recent fabrication because it is very detailed and includes many facts that he left out of his statement to Detective Porter; and (4) Taylor's trial testimony is not supported by the other evidence in the case and his flight reflects his consciousness of guilt, which is not consistent with

75

Mumford dying as a result of an accidental fall.

### 1. Taylor did not tell Detective Porter that he and Mumford fell down the stairway

Taylor's testimony about the fall down the stairway is not believable because he did not mention it when he spoke to Detective Porter. Taylor did not mention the fall despite the fact that Detective Porter asked him many times to explain what happened. Indeed, Taylor did not even mention the fall the two times he talked to Detective Porter about leaving the townhouse. Those would have been perfect opportunities for Taylor to tell Detective Porter about he and Mumford falling down the stairway if that is what really happened. Taylor did not do so. Instead, Taylor stated:

> WP: How long do you think that happened...how long do you think you...that the...the whole fight lasted?
>
> ET: I've been trying to figure that out too.
>
> WP: I mean...Five minutes? Twenty minutes?
>
> ET: I don't even know how it was initiated. I don't even remember how it was initiated.
>
> WP: Did you hit her with the...with the frying pan one time?
>
> ET: I remember picking one up.
>
> WP: You did pick it up, the one sitting on your island there?

76

ET:   She had a knife. She was cutting something; like getting ready to cook or something. And I don't man...I don't know how it started man, but I was trying to leave - - you know. I think it started on the steps because I was gonna leave. And I really wasn't going nowhere. I was just gonna go outside. And it just took off from there man and went into some whole different shit, you know; some whole different shit.[37]

*******************

WP:   In front of your friends?

ET:   Yeah. Yeah I said babe why are you talking – I'm grown. I pay bills here. I pay your bills you know. I don't care. I don't give a fuck _____ You know. And ahh anyway off we go. I said give me the keys. I said I also have to get out here. Which I wasn't. I was just gonna go outside. And umm she threw the keys or something and I can't remember man I can't really remember. Anyway in the process of me going to get the keys, this is after the knife deal you know what I'm saying. And in the process of going to get the keys all this other shit started happening man and we tussled and shit and now I can't really remember man. And we fought – not really.

WP:   It was one-sided fight. I mean I'm just saying that right or wrong.

ET:   Of course you're right.[38]

Taylor talked to Detective Porter twice about wanting to leave the townhouse.

---

[37] Court Ex. N.9 at 12-13.

[38] *Id.* at 19.

Those were the perfect times in the interview for Taylor to tell Detective Porter about the fall. Taylor said both times that it started when he was getting ready to leave. Taylor told Detective Porter that "it just took off from there man and went into some whole different shit." Taylor also told Detective Porter that "all this other shit started happening man and we tussled and shit and now I can't really remember man." Taylor told Detective Porter "and we fought – not really."

This exchange started with Detective Porter asking Taylor how long the fight lasted. It ended with Detective Porter stating that it was a one-sided fight right or wrong and Taylor telling Detective Porter "of course you're right." Taylor never told Detective Porter that he and Mumford accidentally fell down the stairway instead of engaging in a one-sided fight. Taylor did not do so because he and Mumford did not fall down the stairway. Taylor testified at trial that he and Mumford accidently fell down the stairway when she jumped on his back to prevent him from leaving the townhouse. The jury obviously concluded that Taylor fabricated the story about he and Mumford falling down the stairway, making Dr. Hameli's testimony irrelevant because no such fall occurred.

> 2. Taylor's statements to Detective Porter are basically the confession of a guilty man who recognizes that he is full of <u>rage and that he is too dangerous to be around other people</u>

Taylor makes a number of statements in his interview with Detective Porter

78

that are unusual and have nothing to do with his accidental fall defense. Taylor did not tell Detective Porter that Mumford jumped on his back in an effort to keep him from leaving the townhouse, causing them both to tumble down the stairway with Mumford's head crashing into the drywall at the base of the stairway. Instead, Taylor made it sound like his mind and body were taken over by an evil spirit that killed Mumford. Taylor repeatedly told Detective Porter that he just did not know what happened. While he did not "know" what happened, Taylor did know, as reflected in his statements to Detective Porter, that he was going to go to jail for what he did to Mumford and did not want to be placed in a position where he would do such a thing again, stating:

> I don't ever want to see that man that acted that way again in life ever because it's not a good thing. And I don't want to see that again. I don't want to be placed in a position to where I would have to see him again even around other people, inmates, guards, because he don't care.[39]

The following are excerpts of Taylor's statement to Detective Porter where Taylor talks about not knowing what happened, mentions rage, blames it all on a demon inside and wants to be segregated from other inmates and guards when he goes to prison.

> WP: Well I mean the bottom line's this, things got out of hand

---

[39] *Id.* at 16.

ET: and it wasn't man...I swear to God. I swear to God. <u>Man, there's certain things I believe in and some shit I don't believe in. It wasn't me man – you know.</u>[40]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WP: So you're home with your buddies.

ET: I'm home with the guys. Baby comes straight up the steps. Not hello – none of that. And just goes to ghetto _____. I said hello baby I said hello sweetheart. I say I have guests here I said I'll talk to you in a little while. She's just carrying on – carrying on. She jumped in the truck – hauled ass. I mean I don't know where you've been, what you're doing, you know, I'm at home though. I mean what other place can I be? (SIGH) All right. The guys leave. <u>I don't know how it started man. Ahh. I'm not gonna sit here and blow smoke up your ass and shit. But I do know, but that ain't me man. But that ain't me. I'm not gonna get into no religious aspect of it. I'm not gonna ask you to understand it.</u> You got a job to do. At that point, only thing I can ask you to do is do your job. But ahh

WP: What ahh

ET: I don't know.

WP: You just think all the stress built up.

ET: <u>Yeah, I don't know what happened man. Do you see what I'm saying?</u>[41]

---

[40] *Id.* at 6.

[41] *Id*. at 9.

*********************

ET:	<u>And if I could explain to you what happened. If I could put in scientific facts...if I could write it down I would. I can't tell you what possessed me or us because it came out the sky blue from nowhere. I don't know.</u>

WP:	Never...never done anything or acted like that before?

ET:	Me? I wouldn't say that. I wouldn't say...I'm not gonna lie to you. <u>I have violent tendencies but nothing ever like that ...ahh...You know man ahh</u>

WP:	When you...let me ask you this real quick Emmett, when you left there what...what's going through your mind when you...when you're walking out that door; getting in your Tahoe?

ET:	<u>This shit is crazy. I'd done lost my damn mind. What the fuck's going on. I gotta get the fuck out of here man.</u>[42]

*********************

ET:	I don't know her. I didn't know her I mean, I just, I just met them like a couple days ago you know. I met them through another chick I had met you know. In all honesty, I mean, I pretty much told these people look man I got some problems you know what I'm talking about and I don't know what the fuck to do. And this is the situation with me. I'm not gonna lie to you man. I don't expect no pity. I don't expect nothing from nobody. Do you understand detective? You know, but I don't want your job to be hard. And man I, most of all what I really don't

---

[42] Court Ex. N.9 at 10.

81

want, is for...this to go any farther than it is already been. Because for me it's over with. And I accept that. I don't have a problem with that you know. <u>You asked me what happened man I can't tell you. I'm not...by the time you figure it out you'll ride around in a great big circle too because there was nothing wrong.</u> There was nothing wrong you know. It's not that I didn't want to do it. I don't...I did not want to marry her. I loved her man. I mean I wanted that more than anything in the world. I'll fight the whole world to do it. But I can't fight the world and her too.

WP:   Something snapped Emmett?

ET:   <u>Without a doubt</u>.

WP:   Something snapped.

ET:   <u>In a bad way</u>.

WP:   And everybody I talked to, Emmett ain't that way.

ET:   I'm not.

WP:   I mean they said they've seen you do a couple, you know, punch your truck or

ET:   yeah.

WP:   whatever, but that's a far cry from what happened here.

ET:   <u>Yes it is. Yes it is</u>.[43]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[43] *Id.* at 10-11.

WP: Down at the bottom of the stairs, and I'm just doing this for my curiosity, the bottom of the stairs it looks like Stephanie went down the stairs and knocked a hole in the drywall. But then she...she came back upstairs, did you bring her back upstairs or did she get...walk upstairs on her own?

ET: I don't know. It's like...

WP: Did you rip her clothes off? Do you remember doing that at least?

ET: <u>Man it's like being in a forest fire and when the smoke clear and you look around, and all the chaos and the carnage and shit and you go what the fuck. What I supposed to have done man? Call somebody and tell them this shit and ask them to understand man I don't know. I don't know what to do. I still don't know what to do. I mean I don't know if I should be talking to you about this. But you know what, I know I can't undo this you know. I know I can't undo this.</u>

WP: Well you must be thinking in your mind then, you must be thinking and have been thinking for the past couple days, I done screwed up. I might as well own up to it.

ET: That wasn't even the situation. I mean yeah.[44]

*********************

ET: No I mean, listen man. Life don't owe me nothing. I done everything for a man to do. I'm one step from paradise and fell in hell. I had everything that a black man would want. That's obvious and fell in hell.

---

[44] *Id.* at 11-12.

WP: You did good.

ET: I fucked up.

WP: How long do you think that happened...how long do you think you...that the...the whole fight lasted?

ET: I've been trying to figure that out too.

WP: I mean...Five minutes?  Twenty minutes?

ET: <u>I don't even know how it was initiated.  I don't even remember how it was initiated</u>.

WP: Did you hit her with the...with the frying pan one time?
ET: I remember picking one up.

WP: You did pick it up, the one sitting on your island there?

ET: She had a knife.  She was cutting something; like getting ready to cook or something.  And I don't man...I don't know how it started man, but I was trying to leave - - you know.  I think it started on the steps because I was gonna leave.  And I really wasn't going nowhere.  <u>I was just gonna go outside.  And it just took off from there man and went into some whole different shit, you know; some whole different shit.</u>[45]

*********************

WP: Each time I talk to somebody that's been involved in a crime like you've been involved in, I'm curious as an investigator what happened in this room.  Well, you know, reasons you know, did you hit her with the frying pan?  You're saying you remember picking it up.

---

[45] *Id.* at 12-13.

ET: Yeah I remember picking it up.

WP: Do you remember hitting her with it?

ET: I...yeah...yeah...I had hit her with it you know. I think...it was self defense mechanism you know. Black woman with a knife syndrome type thing you know. <u>And that's...I think that's where the initial rage started.</u> You got a knife at me? The same guy that went broke trying to pay all your bills and marry you and it just...that's when I took an itty bitty snowball, and rolled it and let it melt. If...if that's an analogy for you that you can understand. I mean combined with everything else and it took off.

WP: I'm trying to figure out the clothes thing too.

ET: <u>Fighting man. Fighting...and it wasn't me. You know, it wasn't me. I mean...do you want to know something man realistically, I'm more afraid of my soul at this point and what had happened to me then anything else you know.</u>

WP: Yep.

ET: It's something else man. This has nothing to do with you, your job, nothing. <u>This is some spiritual shit and then me and her had been talking</u>...we had just came from Detroit man. We had been out on like this...on our vacation to visit my brother and my people and stuff and you know and it wasn't even nothing like this.[46]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ET: But no I don't...I'm not gonna sit here and tell you that um - - you know. That I had any one particular thing. I did know I didn't want to jeopardize any of my people I wasn't

---

[46] Court Ex. N. 9 at 13-14.

85

gonna do that. And I knew that you guys have a job to do and that you were probably doing your job just like you're doing it now. So I was not surprised by this. You know, I ask two things. <u>I don't ever want to see that man that acted that way again in life ever because it's not a good thing. And I don't want to see that again. I don't want to be placed in a position to where I would have to see him again even around other people, inmates, guards, because he don't care.</u>[47]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WP: Okay. Okay you said you wanted to ask me something.

ET: Like I said, that's all I'm asking is that you know that her family be ahh you know be spared any more suffering than what has already taken place and <u>I not be placed in a position to where this might happen again because obviously there's a part of me that I don't know that exists and I don't want to see that no more.</u> Can you understand detective?

WP: I understand.

ET: I don't.

WP: I understand exactly what you're saying. You just want to...you don't want nobody else to get hurt.

ET: No, that's an entirely different creature altogether. I thought maybe, which I have been wresting with, <u>I've been joking and wrestling with you know split personality, you know what I'm saying. But I think it's very, very real. What if it be spiritual I have manifested so.</u> I always thought it was a joke, something to laugh at.

---

[47] *Id.* at 16.

WP: Right.

ET: It's not. So...[48]

******************

WP: Do you remember if she was saying anything to you during this fight?

ET: Only thing I remember realistically...is me walking to the sink and she was cutting up something...opening something with a knife and I went to the sink to get ice or something – or a glass or I don't remember and she turned around and she had the knife and I just instantly grabbed her wrist. And not that, I'm not saying that she did it intentionally,

WP: Right.

ET: you know what I'm saying

WP: She turned with a knife...I mean she's not saying, "Emmett I'm gonna kill you" with a knife, you're just saying she turned with a knife.

ET: I think that she might have felt that I was upset. Because if I had told her to go ahead wherever you're going, wherever you been, whatever you have been doing, I said go back and do it. You know what I'm saying? And I...we was basically...I was joking with her. I think that she became mad because to me it was funny but it wasn't funny, I was just trying to be humorous and just try to make the rest of the week man. And when she came in the house me and Carl was sitting there and me and Carl and his friend were sitting there and we was just drinking, and she came in and just came to the stairs and raised a million

---

[48] *Id.* at 17.

87

lies worth of hell. Emmett Taylor I've been looking for you. All this carrying on and all this screaming and stomping and picking up stuff, she's throwing it all over the house.

WP: In front of your friends?

ET: Yeah. Yeah I said babe why are you talking – I'm grown. I pay bills here. I pay your bills you know. I don't care. I don't give a fuck _____ You know. And ahh anyway off we go. I said give me the keys. I said I also have to get out here. Which I wasn't. I was just gonna go outside. And umm she threw the keys or something and I can't remember man I can't really remember. Anyway in the process of me going to get the keys, this is after the knife deal you know what I'm saying. And in the process of going to get the keys all this other shit started happening man and we tussled and shit and now I can't really remember man. And we fought – not really.

WP: It was one-sided fight. I mean I'm just saying that right or wrong.

ET: Of course you're right.[49]


*******************

ET: Me too man. I don't know what happened. I don't know what happened. But as I said, you know, I don't want to be put in a situation. I don't care if I got to be an administrative segregation or something whatever.

WP: Okay. I know what you're saying.

---

[49] *Id.* at 18-19.

88

ET: <u>I don't want to be put in a situation because this...you know she knows everybody.</u>

WP: Right.

ET: I don't want to be in this situation where I would have to do it again. That's not what I want. I just want to get over this and whatever comes behind it just do it and make it quick and I don't want to make a mockery out of it.

WP: Okay.

ET: That's all I want.[50]

In summary, when Taylor spoke to Detective Porter a mere four days after Mumford's death, he did not know what happened, did not mention that Mumford fell down the stairway and crashed her head into the wall at the base of the stairway, blamed it all on something that was not him, and knew that he was going to jail and should not ever be around other inmates and guards again. Indeed, while Taylor did discuss getting his keys and getting ready to leave the townhouse, he did not mention Mumford's "accidental fall" down the stairway. Instead, he mentioned a struggle and a fight, which Taylor described as a one-sided fight. Taylor's own words are the words of a guilty man.

---

[50] *Id.* at 23.

### 3. Taylor's trial testimony appears to be a recent fabrication because it is very detailed and included many facts that he left out of his statement to Detective Porter

#### Taylor's Statement to Detective Porter

In summary, Taylor told Detective Porter that on August 13, 2007 (1) he was stressed-out over work and the cost of the wedding, (2) Stephanie came in and argued with him in front of his friends, (3) after the friends left Mumford was at the kitchen sink using a knife, (4) Mumford turned around towards Taylor with the knife in her hand, (5) Taylor grabbed her wrist and hit her with the frying pan, (6) this started another fight that was one-sided, and (7) Taylor left the townhouse and went to Washington, D.C.

#### Taylor's Trial Testimony

When Taylor testified at trial, he presented a markedly different and more detailed picture of what occurred.

> Taylor had been drinking, having had at least a half pint of Crown Royal before he and Mumford argued. Taylor stated that he was irritated with Mumford and that evening she had disrespected him and cursed him out in front of his friends. Taylor asked Mumford to leave and she did, returning about 20 minutes later in a better mood. Taylor's friends left around 10:00 p.m. After that, Mumford became increasingly agitated and threw clothes around the house as Taylor watched. At one point, Mumford appeared to calm down and went to the sink and started chopping food for dinner. Taylor said he went to stand behind Mumford to grab a tumbler from the cabinet above her. Mumford spun around with a butcher knife. Taylor, thinking she was trying to cut him,

90

grabbed Mumford's hand as she came towards him, she grabbed his shirt and they struggled over the knife. Taylor picked up a frying pan and, at first, swiped the knife with it, but then struck her head with it. Taylor and Mumford struggled all over the house, knocking things over as Mumford just became stronger and stronger. Taylor finally got the knife away from Mumford and put it on top of the refrigerator. Taylor also put the frying pan down. Mumford was holding her bleeding face and crying. Taylor decided to leave and headed for the front door. As he got to the first set of steps, Taylor said that Mumford grabbed him by the arm and jumped on his back to keep him from leaving. Taylor spun around and they hit the wall but Mumford would not let go. Taylor spun around again and they both fell down the stairs with Taylor on top of Mumford. Mumford's head went through the wall at the bottom landing. Taylor denied throwing or pushing Mumford down the steps. Because her head was bleeding, Taylor told Mumford that she needed a doctor, but she refused and stated she was fine. Taylor and Mumford went to the garage and washed the blood from her hair and then walked back into the house and took off her wet clothes. During this time, Mumford became amorous and Taylor ripped off her bra and panties. Mumford got cucumbers from the refrigerator and baby oil from the bedroom and they engaged in consensual sexual activity using cucumbers, which Taylor photographed. While taking the photographs, Taylor notice Mumford's face swelling. Taylor took at least one more picture and then they went to the bathroom where Mumford spat blood. While Mumford stayed in the bathroom, Taylor went to the couch and fell asleep. When Taylor woke up, Mumford was dead in the bathroom. Because Mumford was dead, Taylor did not even consider calling 911. Taylor panicked and "got the hell out of there," ending up in Washington, D.C., where he was taken into police custody three days later. When asked why he did not provide this detailed information to Detective Porter, Taylor stated repeatedly that he was not asked.

### Taylor's Cross-Examination

The State destroyed Taylor's credibility on cross-examination. The State

forced Taylor to admit many times that when he spoke to Detective Porter that he had

91

left out parts of the story he told at trial. Some of what Taylor left out was absolutely critical to his trial strategy of self-defense and accidental fall. The State forced Taylor to admit that: 1) he did not tell Detective Porter he asked for Mumford's ring back; 2) he did not tell Detective Porter he and Mumford discussed alternatives to getting married on the August 18, 2007; 3) he did not tell Detective Porter anything about the conversation he had with Mumford while she was at the sink and he was next to the trash can; 4) he did not tell Detective Porter about seeing Mumford on Route 24 earlier in the day; 5) he did not tell Detective Porter about Mumford coming to the shop and asking for money for a dress; 6) he did not tell Detective Porter that Mumford was more hospitable toward Gibbs and Perez when she returned to the townhouse; 7) he did not tell Detective Porter about Mumford showing her ring to Gibbs and Perez; 8) he did not tell Detective Porter about Mumford inviting Gibbs and Perez to the wedding; 9) he did not tell Detective Porter that Mumford came at him with a knife and that he hit her with a frying pan; 10) he did not tell Detective Porter about both of them going down the stairway; 11) he did not tell Detective Porter he asked Mumford for the ring back; 12) he did not tell Detective Porter that while he was sitting on the couch, Mumford was spitting up blood while they were discussing alternatives to getting married; 13) he did not tell Detective Porter anything about Mumford going down the stairway and knocking a hole in the drywall

or the two of them going down the stairway; 14) he did not tell Detective Porter about him knocking into Mumford and her head banging against the drywall and his shoulder bumping up against her head; 15) he did not tell Detective Porter anything about going down the stairs with Mumford; 16) he did not tell Detective Porter anything about coming back up the stairs or Mumford walking up them; 17) he did not tell Detective Porter anything about going into the garage and washing the blood off Mumford's head and her clothes getting wet; 18) he did not tell Detective Porter that as he was helping Mumford get out of her wet clothes she got excited and started to undo his pants; 19) he did not tell Detective Porter that Mumford went to the refrigerator and got the cucumbers, and asked if he wanted to do it the garden variety way; 20) he did not tell Detective Porter that she started coming at him with a knife, grabbed his shirt, and almost pushed him out the window; 21) he did not tell Detective Porter he asked for Mumford's ring back at this point; 22) he did not tell Detective Porter that Mumford threw the engagement ring and another ring at him; 23) he did not tell Detective Porter he put the two rings in his pocket; 24) he did not tell Detective Porter that Mumford jumped on his back as he walked down the stairs; 25) he did not tell Detective Porter that he was on the landing with Mumford on his back when they went into the wall; 26) he did not tell Detective Porter that they tumbled down the rest of the stairway to the garage level; 27) he did not tell

93

Detective Porter any information about the frying pan; 28) after being asked if he ripped Mumford's clothes, he still did not tell Detective Porter that he was helping Mumford with her clothes or what happened after he took them off; 29) he did not tell Detective Porter that Mumford went running to the refrigerator and pulled out cucumbers or went running upstairs for baby oil; 30) he did not tell Detective Porter that Mumford came at him with a knife; 31) he did not tell Detective Porter anything about Mumford's rage; 32) he did not tell Detective Porter anything about Mumford turning toward him with a knife, him asking for the ring back, and having it thrown at him; 33) when asked about the torn clothes, he did not tell Detective Porter that he ripped the shirt off to help with the blood on Mumford's head, and then she became affectionate; 34) he did not tell Detective Porter anything about them falling down the stairs together, Mumford jumping on his back, or his elbow going through the wall; 35) when asked about injuries, he did not tell Detective Porter anything about failing down the stairs, his elbow impacting the wall, being completely upside down on the stairs, Mumford's head impacting the wall, and then falling into Mumford; 36) he did not tell Detective Porter that the impact from falling down the stairs or the double impact on Mumford hitting the wall and him hitting her; 37) he did not tell Detective Porter that Mumford came at him with a knife, driving him backwards and almost out the window; 38) he did not tell Detective Porter that

94

Mumford grabbed his shirt, wouldn't let go, pushed him back, knocked over the plants, and tussled around the kitchen until he could get the knife out of her hand; 39) he did not tell Detective Porter he was being driven backwards and almost out the window while Mumford wouldn't let go of the knife; 40) he did not tell Detective Porter the details of how Mumford was coming at him with the knife; 41) he did not tell Detective Porter that he asked for the ring back; 42) he did not tell Detective Porter anything about the cell phone pictures; 43) he did not tell Detective Porter about any of the activity between himself and Mumford after she nearly drove him out of the window with the knife and the fall down the stairs.

The State forced Taylor to admit 10 times that he did not mention Mumford's fall down the stairway when he talked to Detective Porter.

Taylor gave a very vague statement to Detective Porter about what happened only four days after Mumford was found dead. Despite being asked many times by Detective Porter to explain what happened, Taylor did not do so, often saying he just did not know happened. However, Taylor gave very detailed trial testimony about what happened that night. On cross-examination, the State forced Taylor to admit that when he spoke to Detective Porter he did not tell him many of the things he talked about at trial. Most telling, Taylor completely left out the alleged fall down the stairway with Mumford that left a big dent in the drywall when her head crashed

95

into it. That certainly had to be a memorable event for Taylor. Yet Taylor remembered nothing about it when he spoke to Detective Porter. The fact that he left it out was powerful evidence that it never happened and that his trial testimony about the fall was a recent fabrication.

Taylor's accidental fall defense is inconsistent with the<br>other evidence and Taylor's flight from the crime scene

Taylor's accidental defense is also inconsistent with the other evidence. Taylor is a big man who did manual labor for a living. Mumford is a small woman. Taylor and Mumford were supposedly involved in a violent struggle in the kitchen that ended up with them both falling down the stairway. Taylor did not have a scratch on him. Mumford was battered, bruised, bloodied and dead. Mumford's hair, fake fingernails, and dental appliance were found on the stairway. There was blood found in the kitchen, bathroom and stairway. The blood came from Mumford, not Taylor.

Taylor also behaved like a guilty man. Taylor fled the townhouse and then made statements tantamount to an admission of guilt. If Taylor was not responsible for Mumford's injuries, then he should have taken Mumford to the hospital or called 911 for assistance. Instead, Taylor allegedly went to sleep while Mumford was spitting up blood in the bathroom. Taylor should have called the police when he woke up and found Mumford dead and explained what happened to her if her death was just

an accident. Taylor did not. Instead, Taylor fled to Washington, D.C., with a plan to go west and disappear in to one of the large cities there. Taylor said he panicked and fled after finding Mumford dead. Taylor fled because he was guilty. Taylor simply did not behave like an innocent man.

Dr. Hameli's opinion about the cause of Mumford's death is irrelevant because (1) it is largely consistent with the State's theory as to Mumford's cause of death, and (2) rests entirely on Taylor's testimony. Taylor basically argues that the State's theory was that he beat Mumford to death with the frying pan. Thus, he hopes to be exonerated by arguing that Mumford died in an accidental fall down the stairway. The trouble with Taylor's argument is that the State's theory is much broader than Taylor would like it to be. The State's theory was that Taylor, in some fashion, beat Mumford to death. That included Taylor hitting Mumford with the frying pan and slamming her head into the wall at the base of the stairway and any other hard surface in the townhouse. Both Dr. Hameli and Dr. Tobin concluded that Mumford died as a result of blunt force trauma to the head. Dr. Hameli said the blunt force trauma was caused by Mumford's "fall" down the stairs. The trouble with Dr. Hameli's opinion is that it rests entirely on Taylor's testimony that there was such a fall. Taylor's testimony was just not credible and was rejected by the jury. The jury simply did not believe that Mumford, after being hit by Taylor with the frying pan and engaging in

a violent fight in the kitchen, jumped on his back to keep him from leaving the townhouse, causing them both to accidently fall down the stairway.

### Dr. Hameli and the Cucumber Photographs

Dr. Hameli believes that Mumford was alive when Taylor took the photographs of the cucumbers in her vagina and rectum. Dr. Hameli did not reach his opinion by examining the information gathered by Dr. Tobin during Mumford's autopsy. Dr. Hameli also did not reach his opinion by examining the photographs of the cucumbers in Mumford's rectum and vagina. Instead, Dr. Hameli backed into his opinion by looking at the photographs of Mumford's dead body in the bathroom. Dr. Hameli concluded that since Mumford was found dead in the bathroom, then she had to be alive when Taylor took the cucumber photographs.

Taylor took the cucumber photographs when Mumford was lying naked on the floor at the base of the stairway going from the second to the third floor. The cucumber photographs do not show Mumford's face. Mumford's children found her dead the next day in the bathroom on the second floor. Dr. Hameli theorizes (1) that Mumford was dead when the cucumber photographs were taken and then moved into the bathroom, or (2) alive when the cucumber photographs were taken and then moved into the bathroom where she died. Dr. Hameli believes that Mumford was alive when the cucumber photographs were taken and then died in the bathroom

98

because (1) there were blood smears in the bathroom, suggesting to Dr. Hameli that she was alive and moving in there at some time and then died, (2) the location of her body in the bathroom made it difficult to close the door properly, suggesting to Dr. Hameli that she was alive when she went in there because it would have been difficult for Taylor to put her in there and leave the bathroom, and (3) full rigor mortis had set in given the position of her body in the bathroom. Thus, Dr. Hameli's theory is that if she was alive in the bathroom, then she was not dead when Taylor took the cucumber photographs of her naked body lying on the floor by the stairway.

I believe there are flaws with all aspects of Dr. Hameli's opinion. Moreover, I believe Dr. Hameli's opinion is outside his area of expertise as a forensic pathologist. The role of a forensic pathologist is to conduct a detailed examination of the decedent's body to reconstruct the cause and manner of death.[51] Dr. Hameli did not reach his opinion by examining the information gathered by Dr. Tobin during Mumford's autopsy. Dr. Hameli has simply exceeded his area of expertise and offered lay testimony. Thus, I conclude that his opinion about Mumford being alive when Taylor took the cucumber photographs to be inadmissible and irrelevant.

Nevertheless, I will complete my analysis of Dr. Hameli's opinion. No one except Taylor knows the sequence of events. Mumford could have died in the

---

[51] *U.S. v. Vega-Penarete*, 974 F.2d 1333 at *2 (4th Cir. 1992) (TABLE).

99

bathroom, then been taken by Taylor to the floor by the stairway, and then taken by Taylor back into the bathroom, causing her blood to be smeared in the bathroom one or both of the times. No one knows the exact position of Mumford's body when she died. Shaunna found her mother dead in the bathroom. Shaunna testified that she opened the bathroom door and found her mother lying on the bathroom floor behind the door. If Shaunna could open the door to get in, then Taylor could have just as easily opened the door to get out. Dr. Hameli did not testify when rigor mortis set in, making his statement about that unhelpful. Dr. Hameli's opinion is based on nothing more than speculation. I do note that Mumford looks just as dead in the photographs taken of her in the bathroom as she does in the cucumber photographs. I also note that Mumford's eyes are conveniently not shown in the cucumber photographs. That is, of course, because Mumford was dead and Taylor did not want anyone to see her eyes. In any event, I find Dr. Hameli's testimony inadmissible and wholly unpersuasive.

I conclude that Taylor's Trial Counsel's failure to obtain a forensic pathologist to determine the cause and manner of Mumford's death did not unfairly prejudice Taylor's right to a fair trial.

## Argument 5

## The Cookware Expert

Taylor argues that his Trial Counsel should have retained a cookware expert to determine the degree of force necessary to damage the frying pan. The frying pan was made of lightweight aluminum and misshapen. Taylor argues that this was important because the jury viewed the frying pan as the murder weapon because he conceded that he hit Mumford with it. Taylor retained an expert in cookware manufacturing who concluded that the deformities in the frying pan were not caused by striking either a human head or body. Taylor argues that he was prejudiced by this because the jury drew an unwarranted inference that the frying pan was the murder weapon.

I disagree. Taylor's argument is mere speculation. Taylor suffered no prejudice as a result of his Trial Counsel's failure to retain a cookware expert. This is nothing more than Taylor's creation of an argument that the State never made in order to find prejudice. Mumford was not killed by a gun or knife. Mumford instead died as a result of blunt force trauma to her head. Thus, there was no obvious cause of death. The State argued that Taylor in some fashion beat Mumford to death. Taylor argued that Mumford died as a result of his efforts to defend himself against her knife attack and/or accidental fall down the stairway. The State's forensic expert

did not know the manner of Mumford's death. Taylor's own forensic expert did not know the manner of Mumford's death.

The State did not argue that the frying pan was the murder weapon. The State did not argue that Taylor hit Mumford with the frying pan so hard that it was misshapen by the blows. The State did argue that Taylor inflicted blunt force trauma to Mumford's head, causing her death and that this could have been caused by any number of things, including the frying pan, Taylor's fists, the wall at the base of the stairway where Mumford's head crashed into, and any other hard surface. Dr. Tobin, the State's medical expert, testified that the frying pan could have caused some of Mumford's injuries. She did not testify that the frying pan caused Mumford's death. I also note that the mere fact that the deformities in the frying pan were not caused by Taylor hitting Mumford in the head with the frying pan does not mean that Taylor did not hit Mumford in the head with the frying pan. The only thing that it means is that the frying pan was misshapen by either heat from the stove or by hitting an object harder than Mumford's head.

I conclude that there was no need for Taylor's Trial Counsel to hire a cookware expert and that their failure to do so did not unfairly prejudice Taylor's right to a fair trial.

Plea Negotiations

Taylor argues that his Trial Counsel's failure to retain experts who would testify that Mumford sustained a fatal head injury when her head crashed into the wall at the base of the stairway and that the frying pan was not the murder weapon prevented them from being able to negotiate a plea to something less than the charge of Murder in the First Degree.[52] The State's only plea offer to Taylor was to plead guilty but mentally ill to the charge of Murder in the First Degree in exchange for a life sentence. Taylor argues that he was prejudiced by this because he was sentenced to death.

I disagree. The trouble with Taylor's argument is that it is based on his testimony and is premised on his belief that the State would have found his testimony more credible if he had experts who would have been willing to testify at his trial that Mumford sustained a fatal head injury when her head crashed into the wall at the base of the stairway and that the frying pan was not the murder weapon. Every part of Taylor's argument is flawed. The State never believed Taylor's story about he and Mumford "falling" down the stairway when she allegedly jumped on his back to

---

[52] Taylor calls this a fall. Taylor's forensic expert, Dr. Hameli, was unable to offer an opinion as to what caused the "fall," whether it be a trip, push or throw.

prevent him from leaving the townhouse. The State instead believed that Taylor pushed, threw or battered Mumford down the stairway. Taylor's own expert, Dr. Hameli, could not say that Mumford was not pushed, thrown or battered down the stairway. Only Taylor could testify that Mumford fell down the stairway and the State did not believe him.

Moreover, the State believed, in all likelihood based on the State's arguments at trial, that it was Mumford's collision with the wall at the base of the stairway that either killed or badly injured her and that the frying pan was not the murder weapon. The problem is, as I have noted before, that Taylor's testimony about Mumford's fall down the stairway was preposterous. The State vigorously attacked it during cross examination, forcing Taylor to admit 10 times that he never told Detective Porter that he and Mumford "fell" down the stairway. In fact, the issue of Taylor wanting to leave the townhouse came up twice during Taylor's interview with Detective Porter. Instead of saying anything about the fall, Taylor said:

> WP: How long do you think that happened...how long do you think you...that the...the whole fight lasted?
>
> ET: I've been trying to figure that out too.
>
> WP: I mean...Five minutes? Twenty minutes?
>
> ET: I don't even know how it was initiated. I don't even remember how it was initiated.

104

WP:   Did you hit her with the...with the frying pan one time?

ET:   I remember picking one up.

WP:   You did pick it up, the one sitting on your island there?

ET:   She had a knife. She was cutting something; like getting ready to cook or something. And I don't man...I don't know how it started man, but I was trying to leave - - you know. I think it started on the steps because I was gonna leave. And I really wasn't going nowhere. I was just gonna go outside. And it just took off from there man and went into some whole different shit, you know; some whole different shit.[53]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Yeah. Yeah I said babe why are you talking – I'm grown. I pay bills here. I pay your bills you know. I don't care. I don't give a fuck you known. An ahh anyway off we go. I said give me the keys. I said I also have to get out of here. Which I wasn't. I was just gonna go outside. And umm she threw the keys or something and I can't remember man I can't really remember. Anyway in the process of me going to get the keys, this is after the knife deal you know what I'm saying. And in the process of going to get the keys all this other shit started happening man and we tussled and shit and now I can't really remember man. And we fought – not really.[54]

Taylor had two perfect opportunities to tell Detective Porter that he and Mumford fell down the stairway. Instead, Taylor told Detective Porter that "we

---

[53] Court Ex. N.9 at 12-13.

[54] *Id.* at 14.

105

tussled and shit" and "we fought – not really." When asked if the fight was one-sided, Taylor told Detective Porter that of course it was. Taylor did not tell Detective Porter that he and Mumford fell down the stairway because it never happened. Instead, according to Taylor's own words, he and Mumford tussled and fought on the stairway and that it was a one-sided fight.

Moreover, the evidence did not support Taylor's argument that he and Mumford fell down the stairway. Mumford was brutally battered. Taylor did not have a scratch on his body. Mumford lost several fake fingernails, some of her hair, part of her dentures and small amounts of blood. Mumford hit the wall at the base of the stairway with such force that her head dented the drywall. Taylor lost nothing and had no injuries. Even more bizarre, Taylor's story was that after Mumford took a beating in the kitchen and "fell" down the stairway that she became aroused and wanted to have sex with him. That story was just not credible. The State had a very strong case against Taylor and was adamant that it would offer nothing less than a plea to the charge of Murder in the First Degree with a life sentence. Taylor's experts would not have changed anything. Taylor's problem in not being able to negotiate a better plea was not a lack of experts. Taylor's problem was that his own statements and the undisputed evidence put him in a position where he was simply unable to negotiate a better plea.

I conclude that Taylor's Trial Counsel's decision not to retain forensic and cookware experts did not cause Taylor to be unable to negotiate a better plea.

Argument 7

Trial Strategy

Taylor argues that his Trial Counsel were so focused on preparing a mental illness defense based on Dissociative Identity Disorder over his objection that it precluded them from pursuing and preparing for his chosen trial strategy of self-defense and accidental fall. Taylor further argues that when conflicts over strategy arose between he and his Trial Counsel that his Trial Counsel told me that they had doubts about Taylor's truthfulness and were concerned about presenting perjured testimony. Taylor also argues that his Trial Counsel also unnecessarily disclosed to me that Dr. Fink had tentatively concluded that Taylor was a violent man. Taylor argues that this was particularly prejudicial to him because the State's expert, Dr. Stephan Mechanick, testified at the penalty hearing that Taylor was "simply a violent man with a short fuse." Taylor argues that I had to be particularly prejudiced by this because now his own expert and the State's expert agreed that he was a violent man.

I disagree. Taylor was, for a long period of time, interested in pursuing a mental health defense based on Dissociative Identity Disorder. Indeed, Taylor laid the groundwork for this defense in his interview with Detective Porter, stating the

107

following:

> "I thought maybe, which I have been wrestling with, I've been joking and wrestling you know split personality, you know what I'm saying. But I think it's very, very real. What if it be spiritual I have manifested so. I always thought it was a joke, something to laugh at."[55]

Taylor made a number of other similar statements to Detective Porter. Taylor's Trial Counsel testified that Taylor was willing to plead guilty but mentally ill to the charge of Murder in the First Degree in exchange for a life sentence but when the State made that plea offer, Taylor rejected it. Once Taylor made it clear to his Trial Counsel that he wished to pursue the trial strategy of self-defense and accidental fall, his Trial Counsel very competently presented those defenses. Taylor's problem was that his defenses were simply inconsistent both with his prior statements to Detective Porter and the evidence.

I have previously discussed at length why Taylor's Trial Counsel's decision not to retain a forensic pathologist and cookware expert were of no consequence. Regarding Taylor's Trial Counsel's statements to me when Taylor was trying to have them removed, I viewed them as nothing more than a disagreement between Taylor and his Trial Counsel over how best to defend him. Disagreements between an attorney and his or her client over trial strategy certainly arise from time to time in

---

[55] Court Ex. N.9 at 17.

criminal cases. As to Dr. Fink's tentative conclusion, it was not evidence in the case and played no part in my sentencing decision or any other decision I made in the case. I note that it is common for a trial court judge to hear unfavorable things about a defendant – like a confession – that never became part of the evidence at trial. Every trial court judge has granted a defendant's motion to suppress incriminating evidence and then had gone on to preside over the trial and sentence that defendant if he or she is convicted at trial. Moreover, by the time that I sentenced Taylor there was plenty of evidence in the record to support Dr. Mechanick's opinion about Taylor. I also note that it was Taylor who first talked about rage and his violent temper and the need to be kept away from other inmates and guards in his interview with Detective Porter, stating the following:

<u>Violence and Rage</u>

WP:   Never...never done anything or acted like that before?

ET:   Me? I wouldn't say that. I wouldn't say...I'm not gonna lie to you. I have <u>violent tendencies</u> but nothing ever like that...ahh...You know man ahh[56]

********************

WP:   Something snapped Emmett?

ET:   Without a doubt.

---

[56] Court Ex. N.9 at 10.

WP:  Something snapped.

ET:  <u>In a bad way.</u>

WP:  And everybody I talked to, Emmett ain't that way.

ET:  I'm not.

WP:  I mean they said they've seen you do a couple, you know, punch your truck or

ET:  yeah.

WP:  <u>whatever, but that's a far cry from what happened here</u>.

ET:  <u>Yes it is.  Yes it is.</u>[57]

********************

WP:  Do you remember hitting her with it?

ET:  I...yeah...yeah...I had hit her with it you know.  I think...it was a self defense mechanism you know.  Black woman with a knife syndrome type thing you know.  An that's...<u>I think that's where the initial rage started.</u>  You got a knife at me?  The same guy that went broke trying to pay all your bills and marry you and it just...that's when I took an itty bitty snowball, and rolled it and let it melt.  If...if that's an analogy for that you can understand.  I mean combined with everything else and it took off.

WP:  I'm trying to figure out the clothes thing too.

ET:  <u>Fighting man.  Fighting...and it wasn't me.  You know, it wasn't me.  I mean...do you want to know something man realistically,</u>

---

[57]  *Id*. at 11.

110

<u>I'm more afraid of my soul at this point and what had happened to me then anything else you know.</u>[58]

******************

WP: Did you go any time this week?

ET: No

WP: And try to get deposit back for something?

ET: No.

WP: You didn't?

ET: No. Not at all. Not at all. I had made an initial deposit on July 7th – June or July 7th. And me and her got into a...<u>that's the day I punched the truck</u>. You know and um she didn't know anything about that. I had gotten because I decided I wasn't gonna do it.[59]

******************

## Too Dangerous to Be Around Other People

ET: But no I don't...I'm not gonna sit here and tell you that um - - you know. That I had any one particular thing. I did know I didn't want to jeopardize any of my people I wasn't gonna do that. And I knew that you guys have a job to do and that you were probably doing your job just like you're doing it now. So I was not surprised by this. <u>You know, I ask two things. I don't ever want to see that man that acted that way again in life ever because it's not a good thing. And I don't want to see that again. I don't want to be placed in a position to where I would have to see him again</u>

_____

[58] *Id*. at 14.

[59] *Id.* at 20.

111

even around other people, inmates, guards, because he don't care.[60]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ET:   Like I said, that's all I'm asking is that you know that her family be ahhhh you know spare any more suffering than what has already taken place and <u>I not be placed in a position to where this might happen again because obviously there's a part of me that I don't know that exists and I don't want to see that no more. Can you understand detective?</u>[61]

Taylor badly hurt his chances at trial with his statements to Detective Porter. Taylor, in his own words, told the jury that he was a violent man so full of rage that he should be kept away from other people. Taylor also cast doubt on his trial strategy of self-defense and accidental fall when he made statements to Detective Porter establishing that he was responsible for murdering Mumford and should be kept away from other people to prevent him from hurting anyone else. Taylor's own words buried his trial strategy, not his Trial Counsel's alleged failure to thoroughly prepare for and vigorously pursue it. I conclude that Taylor's Trial Counsel did thoroughly prepare for and vigorously pursue his chosen trial strategy.

---

[60] Court Ex. N. 9 at 16.

[61] *Id.* at 17.

112

Argument 8

Prosecutorial Misconduct

Taylor argues that his Trial Counsel failed to object to two incidents of prosecutorial misconduct that occurred during the prosecutor's closing arguments to the jury. The first deals with the prosecutor's statement to the jury about Luther Mitchell's testimony regarding a third call he got from Mumford on the night of her murder. The second deals with the prosecutor's statements to the jury about Taylor's accidental fall defense.

### 1. Mumford's Third Call to Mitchell

Taylor argues that the prosecutor misrepresented Mitchell's testimony about Mumford's calls to him in her closing argument to the jury. Taylor argues that the prosecutor falsely told the jury that Mitchell testified that he missed a call from Mumford around 10:00 p.m. on the night of her murder. The State, according to Taylor, used this alleged misstatement, combined with Mi Jung's testimony that she only heard Taylor's voice and sounds of a fight that started between 10:00 p.m. to 10:30 p.m and lasted more than 30 minutes, to argue that Taylor's attack on Mumford was over by 11:00 p.m. Taylor argues that the State then, in turn, argued that Mumford was dead when the cucumber photographs were taken at 12:32 a.m. in order to prove the abuse charge. Taylor argues that what Mitchell actually said was that he

113

missed a call from the phone at Taylor and Mumford's townhouse at 1:50 a.m. Taylor argues that his Trial Counsel should have objected to the prosecutor's statement.

I disagree. One, Taylor has not put the prosecutor's argument in context. Two, the prosecutor's argument is supported by the evidence. Three, the State used Taylor's own pictures of Mumford taken at 12:32 a.m. and other evidence to prove that she was dead when Taylor put the cucumbers in her vagina and rectum. Four, I gave the jury an instruction on what constitutes evidence, making it clear that what the prosecutor said in her closing arguments was not evidence.

<u>The Prosecutor's Argument</u>

The prosecutor argued to the jury that the fight between Taylor and Mumford started around 10:00 p.m. to 10:30 p.m. and ended around 11:00 p.m. Mitchell's and Mi Jung's testimony is consistent with that. Mitchell last talked to Mumford around 9:45 p.m. Mi Jung testified that she heard banging noises around 10:00 p.m. to 10:30 p.m. and that they lasted more than 30 minutes. Mitchell testified that Mumford called him three times from around 8:45 p.m. to 9:45 p.m., becoming increasingly upset and crying more with each call. Mitchell testified that Mumford told him that she and Taylor were arguing and that Taylor had called her a "whore" and told her to get out of the townhouse. Mitchell testified that the third and last time he and Mumford spoke that night he heard Mumford tell Taylor that "Pete can hear you on

114

the phone" and that he heard Taylor say "I don't care" and then the phone went dead. Mitchell testified that during this third and final phone call that Mumford was trying to tell him what was going on, but was unable to do so because the phone went dead. Mitchell testified that he missed a call from the phone in Taylor and Mumford's townhouse at 1:50 a.m. because he was asleep. Mitchell testified that he did not know who actually called him because he did not answer the phone. Mi Jung's testified that she heard only Taylor's voice and the sounds of a fight between 10:00 p.m. to 10:30 p.m. The prosecutor told the jury that "Pete also testified that he missed a phone call from Stephanie around 10:00 o'clock." Mitchell testified that the phone went dead while he was talking to Mumford around 9:45 p.m. The prosecutor argued that Taylor's vicious attack on Mumford was over by 11:00 p.m. This is supported by both Mi Jung's and Mitchell's testimony. The prosecutor did not argue that Mumford was dead at 11:00 p.m. Thus, when you consider the prosecutor's argument in the context that it was made, then there is nothing misleading about it.

The Prosecutor's Argument is Supported by the Evidence

The prosecutor's argument is supported by Mitchell's and Mi Jung's testimony. Mi Jung testified that she heard banging noises that started between 10:00 p.m. to 10:30 p.m. and that they lasted more than 30 minutes. After they stopped, Mi Jung testified that she went outside and saw Mumford's garage door up. This puts the end

115

of the attack around 11:00 p.m., which is wholly consistent with the prosecutor's argument. While the prosecutor's statement is not what Mitchell said, the point she was making is valid. I believe the prosecutor simply misspoke. The prosecutor was not trying to mislead the jury. Mumford and Mitchell last spoke around 9:45 p.m. They never spoke again. Indeed, no one other than perhaps Taylor ever spoke to Mumford after that. Shortly thereafter, Mi Jung heard banging noises next door and Taylor hollering at Mumford, telling her to get out of the house. So if the point of the prosecutor's statement was that the fight was underway at this time, then that is a reasonable inference, particularly since Mumford's phone went dead around that time. Mi Jung testified that she heard fighting around 10:00 p.m. to 10:30 p.m. and that it lasted more than 30 minutes. Thus, the prosecutor's argument is sound. In any event, the call at 9:45 p.m., for the purposes of Taylor's defense to the abuse charge, is not the most important call. The important call is the one from the phone at Taylor and Mumford's townhouse to Mitchell at 1:50 a.m. Taylor uses this call to argue that Mumford was still alive when Taylor was abusing her with the cucumbers at 12:32 a.m. The problem, of course, with Taylor's argument is that the caller and Mitchell never talked at 1:50 a.m. because Mitchell was asleep and did not answer the phone. Thus, there is no direct evidence that Mumford tried to call Mitchell at 1:50 a.m. In all likelihood, given the battered nature of Mumford's body as shown in the cucumber

116

photographs that Taylor took at 12:32 a.m., it was Taylor trying to call Mitchell, his friend and co-worker, at 1:50 a.m.

## The Cucumber Photographs and Other Evidence

Moreover, given the condition of Mumford's body, as evidenced by the cucumber photographs taken at 12:32 a.m., the only reasonable inference is that Mumford was dead at 12:32 a.m. and that it was Taylor who tried to call Mitchell at 1:50 a.m. Mumford and Taylor were the only two people in the townhouse. It would not be unusual for Taylor to call Mitchell because they were co-workers and friends. Mumford had, by that time, been beaten with a frying pan and had her head slammed into the wall at the base of the stairway. It was this evidence, combined with the cucumber photographs, that proved that Mumford was dead at 12:32 a.m. I find nothing misleading at all about the prosecutor's statements to the jury about the three calls between Mumford and Mitchell.

## The Jury Instruction

I gave the jury an instruction that is designed to deal with this type of situation. I told the jury that their verdict must be based solely and exclusively on the evidence in the case. I also told the jury that "evidence is the testimony of witnesses and every exhibit that was introduced through their testimony." And lastly, I told the jury that "while it is very important that you listen to and consider what the lawyers say and

117

have said to you during their remarks to you, what they say or have said is not evidence." I do not believe there was anything wrong with the prosecutor's statement. In any event, the jury instruction made it clear that what the prosecutor said was not evidence. I do not believe that the prosecutor's statement misled the jury about the three calls between Mumford and Mitchell and the one missed call from the phone in Taylor and Mumford's townhouse to Mitchell. To the extent that there was anything wrong with the prosecutor's statement, the jury instruction I gave corrected it.

### 2. The State's Comments About Taylor's Own Words

Taylor argues that the prosecutor improperly shifted the burden of proof when she, according to Taylor, suggested in her closing argument that Taylor "has the burden to provide scientific evidence to explain the hole in the drywall and how Ms. Mumford returned to the second floor of the townhouse after the hole was made." Taylor's Trial Counsel did not object to this. Taylor argues that they should have. Taylor does not repeat the prosecutor's actual words because they do not support his argument. The following is the prosecutor's statement to the jury:

> Even when Detective Porter asked about the hole in the drywall at the base of the steps and whether Stephanie was brought back upstairs or went back upstairs on her own, Emmett Taylor didn't know. He didn't know what happened. If he could put it in scientific facts, he would, but he couldn't. He didn't remember. And at best, he only vaguely

remembered things like tearing off Stephanie's clothes.[62]

In response to Detective Porter asking Taylor what happened and Taylor saying that he did not know what happened, Taylor made the following statement:

> "And if I could explain to you what happened.  <u>If I could put it in scientific facts, if I could write it down I would.</u>  I can't tell you what possessed me or us because it came out of the sky blue from nowhere. I don't know."[63]

Later on in the interview, Detective Porter was more specific and asked Taylor how Mumford got back up the stairs after going down the stairs and knocking a hole in the drywall with her head.  The following is their exchange:

> Detective Porter:   Down at the bottom of the stairs, and I'm just doing this for my curiosity, the bottom of the stairs it looks like Stephanie went down the stairs and knocked a hole in the drywall.  But then she...she came back upstairs, did you bring her back upstairs or did she get...walk upstairs on her own?

> Taylor: I don't know.  It's like...[64]

There is nothing at all improper about this.  The State did not shift the burden of proof to Taylor.  The State did not suggest or infer that Taylor had to offer scientific evidence to explain the hole in the drywall or how Mumford was able to

---

[62]  Trial Transcript at Q-108-109 (October 29, 2009).

[63]  Court Ex. N.9 at 10.

[64]  *Id.* at 11-12.

walk up the stairway after her head had crashed into the drywall. The State merely used Taylor's own words to show that Taylor's trial testimony was false because he testified differently at trial than when he spoke to Detective Porter long before the trial, suggesting that Taylor had made up a story to explain facts – the hole in the drywall, the stairway littered with Mumford's hair, fake fingernails and dentures and Mumford's bruised and battered body– that he could not explain any other way.

When Detective Porter interviewed Taylor four days after Mumford was found dead, Taylor did not say a word about Mumford accidently falling down the stairway in an effort to keep him from leaving the townhouse and crashing her head into the wall. Taylor also did not tell Detective Porter that after the fall that Mumford's head was bloody and that he and Mumford walked out to the garage and that he washed Mumford's bloody head off and that they then went back into the house and walked up the stairway and had sex with the cucumbers because Mumford had become sexually aroused. When asked to explain what happened by Detective Porter, Taylor often said he did not know. When Taylor testified at trial, he remembered how everything happened. The prosecutor did nothing more than use Taylor's own words to impeach his credibility by pointing out that Detective Porter had already asked Taylor a few days after Mumford's murder to explain what happened and Taylor was unable to do so, but at trial Taylor was ready with a detailed explanation of what

happened.  The prosecutor merely used Taylor's own words to show that Taylor's trial testimony was a recent fabrication.

I conclude that Taylor's Trial Counsel's failure to object to these two allegations of  prosecutorial misconduct did not unfairly prejudice Taylor's right to a fair trial.

Argument 9

The Crime Scene Video

Taylor argues that his Trial Counsel were ineffective because they did not object to the admission into evidence of a crime scene video that had commentary from two unidentified individuals speculating that Taylor threw Mumford down the stairway.  The video is 24 minutes long.  The objectionable part lasts about 30 seconds.  It contains comments made by two unidentified individuals speaking off-camera while a detective is videotaping the kitchen.  The following is the commentary:

> "We get up at the top of the landing, ...blood here, broken plaster, a defect here, defect there, massive defect right there...," "I'm thinking she's thrown here and all the way down to there, definitely impacted that...hard.  Remind you of another scene, John, mmmhmm, has a little less blood, a little less blood."

A few minutes later, an unseen man comments that it was a big struggle and a

121

female voice states "that someone said there was an argument.[65] Taylor argues that he was prejudiced by those statements because they allowed the jury to speculate that he threw Mumford down the stairs.

I disagree. I find that Taylor's Trial Counsel were not ineffective for not objecting to the admission of this video. I further find that Taylor did not suffer any unfair prejudice as a result of the admission of this video. The jury did not hear these comments in Court. When this video was played in Court, the volume was turned off so that the jury would not hear anything at all and would only watch the video portion. The prosecutor wanted the volume turned down so that the "extraneous background noises on the video would not be audible." The prosecutor did not say that there was commentary on the video. Thus, there was nothing that tipped anyone off that there was commentary on the video. If the jury heard those comments at all, then it had to be in jury room. Moreover, I gave the jury an instruction on what is evidence. The instruction states that "evidence is testimony of witnesses and any exhibits that were introduced during the trial." The audio portion of the video was not played in court for the jury. Thus, it was not evidence. Juries are presumed to

---

[65] This was provided by the State. It is not a verbatim transcript. The sound on the video is poor and it had to be played at full volume a number of times in order to provide a reasonable recitation according to the State. I listened to the audio portion of the video.

122

follow the jury instructions.[66] I have no reason to believe that the jury did not follow my instructions.

Taylor's Trial Counsel did not hear these comments until the evidentiary hearing. The testimony at the evidentiary hearing was that: 1) Taylor's Trial Counsel did not know that the video had commentary; 2) Taylor's Trial Counsel played the video numerous times during the pendency of trial, but never heard the commentary; 3) Taylor's Trial Counsel were still unable to hear the commentary even after several attempts on a number of different computers; 4) Taylor's Trial Counsel heard the commentary for the first time on the day of the evidentiary hearing; 5) it is unknown whether the jury played the video and if they did, whether they heard the commentary; and 6) it is unknown what type of equipment existed in the jury room for viewing and listening to the video. I can not fault Taylor's Trial Counsel for not objecting to comments they never heard, particularly since the video appeared to them to have no audio.

Moreover, Taylor has sustained no prejudice. There was direct evidence supporting virtually everything that was commented on in the video. Gibbs and Perez testified that Taylor and Mumford had argued in front of them that evening. Mi Jung testified that she heard Taylor hollering. Mitchell testified that when he and

---

[66] *State v. Monroe,* 2014 WL 2581971, at *6 (Del. Super. June 6, 2014).

123

Mumford spoke on the phone three times that night that Mumford told him that she and Taylor were arguing. An officer speculating that there was an argument between Taylor and Mumford is nothing new. Taylor told Detective Porter that he and Mumford engaged in a one-sided fight. The video certainly reflects that. The video shows the blood, broken plaster and defect in the wall at the base of the stairs. Other witnesses testified to those things as well. Taylor's own forensic pathologist opined that Mumford's head crashed into the wall so hard that she sustained a fatal head injury.

The scene at the house made it obvious that Mumford either fell down the stairway or was thrown or pushed down the stairway by Taylor. The comments by the police officers did not introduce anything that was not already right in front of the jury. Taylor testified that he and Mumford fell down the stairway after she jumped on his back to keep him from leaving the house after they had argued, he had hit her with a frying pan, and they had struggled in the kitchen. Oddly enough, Mumford sustained fatal injuries in the "fall" while Taylor sustained no injuries at all, not even a scratch.

The State's theory was that Taylor, in a violent rage, beat Mumford from head to toe from the kitchen on the second floor to the base of the stairway on the first floor. The prosecutor told the jury that "as this one-sided fight continued through the

124

townhouse, Stephanie at some point went down the steps to the landing, and down even harder to the garage level." The prosecutor also told the jury that Dr. Tobin testified that someone throwing Mumford into the wall could have caused the blunt force trauma to her head. Taylor, under the State's theory, either pushed or threw Mumford down the stairs. That theory was certainly supported by the evidence. The jury heard both theories and concluded that the State's theory was supported by the evidence.

I conclude that it would have made no difference if Taylor's Trial Counsel had questioned the unidentified police officers about their comments or if their comments had been excluded all together. The jury did not find Taylor guilty of murdering Mumford because of the musings of a couple of police officers. It did so because of the mountain of evidence against Taylor, including his own inculpatory pre-trial statements and preposterous trial testimony. I conclude that the commentary on the crime scene video did not unfairly prejudice Taylor's right to a fair trial.

Argument 10

The Penalty Hearing

Taylor argues that his Trial Counsel should have objected to the State's use of Dr. Mechanik's psychiatric evaluation of Taylor during the penalty hearing. Taylor argues that it violated his right against self-incrimination. Taylor also argues that

125

*Del.C.*§4209(c) does not permit the State to offer rebuttal evidence to Taylor's mitigating circumstances. Taylor also argues that his Trial Counsel did not advise him of his right against self-incrimination prior to Dr. Mechanick's examination of him. And finally, Taylor argues that those two things prejudiced his right to a fair penalty hearing.

Taylor initially planned to use a mental illness defense during the guilt phase of the trial based on Dr. Zingaro's opinion that Taylor suffered from Dissociative Identity Disorder. Thus, in accordance with Superior Court Criminal Rule 12.2(c), Taylor was examined by the State's psychiatrist, Dr. Mechanick. Prior to examining Taylor, Dr. Mechanik told Taylor that whatever he told him would not be confidential and that he would share it with the prosecutors. Dr. Mechanick then examined Taylor. Later on Taylor decided not to use Dissociative Identity Disorder as a defense during the guilt phase of the trial. Accordingly, Dr. Zingaro and Dr. Mechanick did not testify during the guilt phase.

After the jury found Taylor guilty, his Trial Counsel told the State that they intended to use Taylor's diagnosis of Dissociative Identity Disorder as a mitigating circumstance against the imposition of the death penalty during the penalty hearing.

Taylor's Trial Counsel offered Dr. Zingaro and Dr. Jeremy Welsh's testimony to support Taylor's mitigation case. Dr. Zingaro is a psychologist. Dr. Welsh is a

therapist and pastoral counselor. Both doctors met with Taylor a number of times and concluded that Taylor was suffering from Dissociative Identity Disorder when he killed Mumford. Dissociative Identity Disorder was previously known as multiple personality disorder. It is a mental disorder that on the dissociative spectrum is characterized by the appearance of at least two distinct and relatively enduring identities or dissociative personality states that alternatively control a person's behavior. Taylor's argument was that his alternate personality – Sergeant Taylor – defended him against Mumford's knife attack and killed her.

The State offered Dr. Mechanick's testimony. Dr. Mechanick is a psychiatrist. Dr. Mechanick testified that Taylor suffered from alcohol intoxication and personality disorder with anti-social features. Dr. Mechanick testified that Taylor did not suffer from Dissociative Identity Disorder.

Taylor did not testify at the penalty hearing. Taylor only exercised his right to allocution. Therefore, he was not subject to cross-examination by the State on the issue of Dissociative Identity Disorder. Even though Taylor did not testify, his diagnosis of Dissociative Identity Disorder was based, at least in part, on his statements to his two doctors.

I disagree with Taylor's argument that 11 *Del.C.* §4209(c) prohibits the State from offering rebuttal evidence to Taylor's mitigating evidence.

Section 4209(c) of Delaware Code Title 11 sets forth the procedure for the penalty hearing. Subsections (1) and (2) address the evidence and arguments that may be presented, respectively.

Subsection (1) states, in applicable part, the following:

> The sole determination for the jury or judge at the hearing provided for by this section shall be the penalty to be imposed upon the defendant for the conviction of first-degree murder. At the hearing, evidence may be presented as to any matter that the Court deems relevant and admissible to the penalty to be imposed. The evidence shall include matters relating to any mitigating circumstance and to any aggravating circumstance, including, but not limited to, those aggravating circumstances enumerated in subsection (e) of this section.

Subsection (2) states the following:

> At the hearing the Court shall permit argument by the State, the defendant and/or the defendant's counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or the defendant's counsel and closing summation by the State.

Subsection (1) expressly provides that "evidence may be presented as to any matter that the Court deems relevant and admissible to the penalty to be imposed" and that "the evidence shall include matters relating to any mitigating circumstance and to any aggravating circumstance." I certainly believe that Dr. Mechanick's testimony was relevant and admissible to the mitigating circumstance of Dissociative Identity

128

Disorder. Section 4209(c) does not state that only the defendant can offer evidence on mitigating circumstances.

The State had the burden of proving unanimously and beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. The State had the burden of proving by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances before Taylor could be sentenced to death. Taylor used Dissociative Identity Disorder as a mitigating circumstance. Taylor put his mental health at issue. Taylor used the testimony of two doctors who had interviewed him to establish that he had Dissociative Identity Disorder when he murdered Mumford. Taylor did not testify at the penalty hearing. Thus, he was not subject to cross-examination by the State on this issue. Therefore, I felt that it was appropriate to allow the State to rebut Taylor's evidence with a psychiatrist who had also interviewed Taylor and whose opinions about Taylor were based, at least in part, on what Taylor had told him during that interview. Thus, the playing field was level for both parties and recognized the fact that Taylor's doctors were offering opinions at the penalty hearing based on his statements even though he did not testify at the penalty hearing. I find nothing at all unusual about this.

The format for a trial is that the State offers evidence to support its charges against the defendant. The defendant may offer evidence on his behalf. If he does

so, then the State may offer rebuttal evidence. I see no reason to treat the penalty hearing any differently. I note that subsection (2) recognizes this as well, allowing for opening statements by each party, opening summation by the State, rebuttal summation by the defendant, and closing summation by the State. That is exactly what happened in the penalty hearing part of Taylor's trial and it tracks the order in which the evidence was introduced at the penalty hearing.

I also find Taylor's argument that his right against self-incrimination was violated to be without merit. Dr. Mechanick told Taylor that whatever he told him would not be confidential. The following is the applicable section of Dr. Mechanick's report:

CONFIDENTIALITY WARNING:

I introduced myself by name at the beginning of the interview. Mr. Taylor told me that he had been informed that I would be coming to see him "for the State." I told Mr. Taylor that I am a psychiatrist and that the prosecutors in this case from the Office of the Attorney General had requested that I perform an independent evaluation of him. I told Mr. Taylor that what he said to me would not be confidential and that it would be included in any report or testimony I provided. Mr. Taylor stated that he understood what I had told him.

When I asked Mr. Taylor whether he had any questions about what I had told him, he asked whether he would be getting a copy of my report. I told Mr. Taylor that I would be providing the report to the prosecutor and that I expected that the prosecutor would provide a copy of it to his attorney.

Taylor certainly knew that what he told Dr. Mechanick was not going to be confidential. Moreover, what Taylor told Dr. Mechanick never would have come up had Taylor not put his mental health at issue during the penalty hearing. Quite frankly, I found it illogical for Taylor to argue that he could use experts who based their opinions on what he told them, but he could not be confronted with the State's expert who had also based his opinion on what Taylor told him. Taylor's argument simply makes no sense. I find nothing at all unfairly prejudicial about the State's use of Dr. Mechanick's testimony at the penalty hearing and I conclude that it did not unfairly prejudice Taylor's right to a fair penalty hearing.

## Argument 11

### The Other Beatings

Taylor argues that his Trial Counsel were ineffective because they did not object to Earline Harris's testimony at the penalty hearing about the two other times that Taylor beat her. Harris testified about the one beating that Taylor gave her that resulted in his *Alford* plea to the charge of aggravated assault in Mississippi that formed the basis of the State's sole statutory aggravating factor. Harris also testified that Taylor beat her two other times and that during one of those other beatings that Taylor anally raped her. Taylor argues that his Trial Counsel should have objected to Harris's testimony about the other beatings and rape so that I could have

131

determined if her testimony was admissible.

If Taylor's Trial Counsel had objected, I would have overruled their objection. The State, during the penalty hearing, argued that Taylor had a history of domestic violence towards women. [67] Thus, Harris's testimony about those other beatings and rape was highly probative of the State's argument and was not unfairly prejudicial. Moreover, evidence of unadjudicated crimes is admissible at a penalty hearing if it is plain, clear and convincing.[68] Eyewitness testimony meets this standard.[69] I find that Harris's testimony about the other beatings and rape did not unfairly prejudice Taylor's right to a fair penalty hearing.

## Argument 12

## The *Alford* Plea

Taylor argues that his Trial Counsel were ineffective because they (1) did not ask me to give the jury an instruction on the nature of an *Alford* plea, and (2) did not ask for permission to offer evidence to the jury as to the nature of an *Alford* plea. The

---

[67] See non-statutory aggravating circumstance number three, which states: The Defendant's prior history of domestic violence against women, including, but not limited to, Earline Harris.

[68] *Ortiz v. State*, 869 A.2d 285, 301 (Del. 2005) (citing *State v. Cohen*, 634 A.2d 380, 391 (Del. Super. 1992) and *Getz v. State*, 538 A.2d 726, 734 (Del. 1988)).

[69] See *Johnson v. State*, 983 A.2d 904, 934 (Del. 2009) (finding eyewitness testimony at penalty hearing sufficient to prove unadjudicated misconduct was plain, clear and convincing).

State's sole statutory aggravating circumstance was that Taylor had been convicted of a felony involving the use of force or violence upon another person. Taylor entered an *Alford* plea in Mississippi to the charge of aggravated assault. Harris was the victim. Harris testified that Taylor beat her so badly that she was in the intensive care ward of a hospital for four days. The State presented certified copies of Taylor's aggravated assault conviction, plea and sentencing order. Taylor was sentenced to 10 years in prison, suspended for the time he had served, followed by three years of supervision.

The State had to prove the statutory aggravating circumstance unanimously and beyond a reasonable doubt. In order to do this, the State had to prove (1) that Taylor had been convicted of a felony, and (2) the felony involved the use of, or threat of, force or violence upon another person. I had ruled before the penalty hearing that an *Alford* plea constitutes a conviction for the purposes of 11 *Del. C.* §4209(e)(1)(i). Thus, there was no reason for me to instruct the jury as to the nature of an *Alford* plea or to allow Taylor's Trial Counsel to offer evidence to the jury as to the nature of an *Alford* plea. Taylor faced a sentence of up to 20 years in prison. Taylor was sentenced to 10 years in prison. That is a sentence for a felony level offense. Taylor's sentencing order, which is titled "Post Release Supervision" and was entered into evidence during the penalty hearing, provided that he had been "convicted of a

133

felony." Harris testified about the violent beating that Taylor gave her that resulted in his aggravated assault conviction.

Moreover, Taylor wants this for an improper purpose. Taylor wants to argue to the jury that what I had determined was a conviction was not really a conviction because he did not plead guilty or was not found guilty by a jury and that he also took the plea to get out of jail. My earlier ruling made all of those arguments irrelevant. I conclude that my earlier ruling that an *Alford* plea constitutes a conviction for the purposes of Delaware's Death Penalty Statute did not prejudice Taylor' right to a fair penalty hearing. I further conclude that there was no need for Taylor's Trial Counsel to (1) request me to give the jury an instruction on the nature of an *Alford* plea, and (2) request me for permission to offer evidence to the jury as to the nature of an *Alford* plea. Such evidence and instruction were irrelevant given my earlier ruling on this issue.

## Argument 13

### The Death Penalty Arguments

Taylor argues that his Trial Counsel should have challenged the constitutionality of Delaware's death penalty statute by raising the following arguments:

## The Jury's Role

Taylor argues that Delaware's death penalty statute is unconstitutional because it permits the death penalty to be imposed absent a jury verdict concluding that the aggravating circumstances outweighed the mitigating circumstances unanimously and beyond a reasonable doubt. Taylor's argument is based on *Apprendi*[70] and has previously been presented by others to the Delaware Supreme Court and rejected by it.[71] Taylor argues that the rationale underlying those decisions is no longer sound. That is for the Delaware Supreme Court to determine.[72]

## The *Alford* Plea

Taylor argues that my finding that his *Alford* plea in Mississippi constituted a conviction wrongfully prevented his Trial Counsel from offering evidence to the jury about the circumstances under which Taylor took the *Alford* plea. Taylor argues that this usurped the jury's obligation to find the existence of the sole statutory aggravating circumstance unanimously and beyond a reasonable doubt. This is largely the same argument that Taylor made in Argument 12. I rejected it then and I reject

---

[70] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[71] See e.g., *Norcross v. State,* 36 A.3d 756, 775 (Del. 2011); *Cabrera v. State,* 840 A.2d 1256, 1273-74 (Del. 2002); *Ortiz v. State*, 869 A.2d 285, 305 (Del. 2005); *Swan v. State*, 28 A.3d 362, 390 (Del. 2011); *Swan v. State*, 820 A.2d 342, 359 (Del. 2003); *Brice v. State*, 815 A.2d 314, 318 (Del. 2003).

[72] *State v. Bailey*, 1991 WL 190294 at *17 (Del. Super. Aug. 23, 1991).

it now for the same reasons. I note that the State presented evidence to the jury (1) that Taylor was convicted of aggravated assault, (2) that the conviction was for a felony, and (3) that Harris testified about the violent nature of Taylor's assault on her, and that the jury found unanimously and beyond a reasonable doubt that Taylor had been convicted of a felony involving violence.

## Lack of Safeguards

Taylor argues that Delaware's death penalty statute is unconstitutional because under it the sentencing judge is permitted to hear highly prejudicial information about the defendant. Taylor argues that because of his Trial Counsel's errors that I heard that they had doubts about his truthfulness. Taylor argues that I also heard that one of his experts had concluded that he did not suffer from Dissociative Identity Disorder and that he was simply a violent man. This is largely the same argument that Taylor made in Argument 7. I rejected it then and I reject it now. I did not rely on those matters when I sentenced Taylor. I sentenced Taylor based only on the evidence that came in during the guilt phase and penalty hearing parts of the trial. There was more than ample evidence to conclude that Taylor was not truthful and that he was a very violent man.

Taylor also argues that Delaware's death penalty statute is unconstitutional because it did not hold his jury responsible for his death sentence. I disagree. I told

the jury that even though I would ultimately make the final decision, the jury had to find unanimously and beyond a reasonable doubt the presence of at least one statutory aggravating circumstance in order to make Taylor eligible for the death penalty. Taylor's jury did that. Thus, it was Taylor's jury that made Taylor's death sentence possible. The jury then had to weigh the aggravating and mitigating circumstances and determine if the aggravating circumstances outweighed the mitigating circumstances. I told the jury that their decision reflected the conscience of the community and that it was an important factor and that I would give it great weight in determining the appropriate sentence for Taylor. The jury found by a vote of 11 to 1 that the aggravating circumstances outweighed the mitigating circumstances. I certainly considered the jury's finding in reaching my decision to sentence Taylor to death. Taylor's argument that his jury bore no responsibility for his death sentence is unfounded.

And lastly, Taylor argues that Delaware's death penalty statute fails the test of "evolving standards of decency that mark the progress of a maturing society." Taylor points out that in the last two legislative sessions, bills have been introduced to repeal the death penalty. Taylor argues that this constitutes some evidence that Delaware's contemporary values are evolving away from State sanctioned execution. Of course, the bills did not pass, suggesting that Delaware's contemporary values have not

137

evolved as far as Taylor would like.

I conclude that Taylor's argument that Delaware's death penalty statute is unconstitutional is not supported by the applicable current law.

Argument 14

Appellate Counsel

Taylor argues that his Appellate Counsel failed to provide effective assistance of counsel by not raising on appeal to the Delaware Supreme Court the following issues:

1. The State's use of Taylor's *Alford* plea to the aggravated assault charge in Mississippi as the sole statutory aggravating circumstance.

2. The State's alleged *Brady* violation.

3. The admission into evidence of the bag labeled "fry pan with blood."

4. The admission into evidence at the penalty hearing of Harris's allegations of uncharged misconduct in Mississippi.

5. The State's use of Dr. Mechanick's testimony at the penalty hearing.

6. The State's allegedly improper statements in both its closing and rebuttal arguments to the jury.

7. The constitutionality of Delaware's death penalty statute.

I have addressed each of those issues already and concluded that there was no merit to them. All of Appellate Counsel's arguments on appeal failed. Thus, I

138

conclude that Taylor's Appellate Counsel were not ineffective for not raising arguments that are, in my view, certainly no stronger than those Appellate Counsel raised on appeal.

## Conclusion

I conclude that there is not a reasonable probability that but for Taylor's Trial Counsel's errors the result of his trial would have been different. I have every confidence in the jury's verdict. Taylor had a remarkably fair and uneventful trial. There were only four things that can be considered errors. One, Delaware State Police Detective Kelly Wells did not get Mi Jung's husband's name when she took his statement. I concluded that her failure to do so did not unfairly prejudice Taylor because Mi Jung's husband's statement was consistent with the other evidence in the case and did not impeach Mi Jung's trial testimony. Two, the evidence bag characterizing the frying pan as having blood on it should not have been submitted to the jury. I concluded that this did not matter because the State's DNA expert testified that the frying pan did not have blood on it and I told the jury that evidence is testimony and exhibits introduced as evidence. The frying pan and the DNA expert's testimony were evidence. The evidence bag was not. Three, the prosecutor misspoke when she told the jury that Mitchell missed a call from Mumford around 10:00 p.m. on the night of the murder. Mitchell testified that the phone went dead

139

around this time when he was talking to Mumford. Mitchell testified further that he missed a call from the phone in Mumford's townhouse at 1:50 a.m. because he was asleep. I concluded that this did not matter because the point of the prosecutor's statement was that no one talked to Mumford after 10:00 p.m., which was correct. I also told the jury that what the prosecutor said in her closing arguments was not evidence. I made it clear to the jury that evidence is testimony and exhibits introduced in court. Four, the audio portion of the crime scene video should not have been sent back to the jury. I concluded that this did not matter because the statements in the video were consistent with the State's theory of the case and supported by the evidence in the case.

The State had a very powerful case against Taylor that was supported by his own statements and other evidence. Taylor and Mumford were alone in their townhouse. Taylor is a big strong man. Mumford is a small woman. Taylor was tired from a long day at work and stressed-out over of the cost of the wedding. Mumford had disrespected Taylor in front of his friends earlier in the evening. Taylor and Mumford argued after Taylor's friends left. This sent Taylor into a rage that, in his owns words, resulted in a one-sided fight. The townhouse was the scene of a terrible fight. There were multiple dents in the drywall, blood on the kitchen floor and a broken planter in the kitchen. Mumford was battered, bruised and bloodied.

140

Mumford's clothes, hair, dentures, and fake fingernails were found on the stairs. Taylor did not have a scratch on him. Taylor's children found her naked dead body in the bathroom the next day. The police found Taylor in Washington, D.C., four days later. Taylor, when interviewed by Detective Porter, spoke of Mumford's failure to respect him and his rage towards her and his need to be kept away from other inmates and guards because he was so dangerous. Taylor belittled his own self-defense argument and never mentioned the accidental fall defense to Detective Porter. Taylor planned to head west and blend into the big cities out there. Taylor ran and planned to hide to avoid responsibility for murdering Mumford.

Taylor's defenses were inconsistent with his own statements and behavior and simply preposterous. The jury certainly did not believe that Mumford wanted to have sex with cucumbers while Taylor took photographs of her after they had engaged in a violent fight in the kitchen and fallen down the stairway so hard that her head dented the drywall and left her battered and bloodied. The cucumber photographs made Taylor's defenses seem preposterous. While there were errors that occurred during Taylor's trial, I have concluded that those errors were inconsequential when viewed in context of all of the damaging evidence against Taylor and caused him no unfair prejudice whatsoever.

I also conclude that Taylor has failed to show that his Appellate Counsel failed

to raise stronger issues on appeal and that prejudice resulted from their decision regarding which issues to raise. Quite simply, the issues that Taylor now raises have no more merit than the ones his Appellate Counsel did raise.

Emmett Taylor's Motion for Postconviction Relief is denied.

IT IS SO ORDERED.

*/s/ E. Scott Bradley*
E. Scott Bradley

ESB/sal